43 P.3d 1233 (2002)
1515-1519 LAKEVIEW BOULEVARD CONDOMINIUM ASSOCIATION, a Washington corporation, Robert A. Ferguson, Douglas A. Taylor, Bruce E. Curnutt, Bruce A. McLaughlin, Frank Y. Fukui and Penny Fukui, husband and wife and the marital community composed thereof, Respondents,
v.
APARTMENT SALES CORPORATION, a Washington corporation, Michael K. Williams and Jane Doe Williams, husband and wife and the marital community composed thereof, Gordon Capretto and Jane Doe Capretto, husband and wife and the marital community composed thereof, Geotech Consultants, Inc., a Washington corporation, Stephen Sullivan dba Stephen Sullivan Architects, Martha Rose dba Rose Construction Management, Gary Swenson and Jane Doe Swenson, husband and wife and the marital community composed thereof, and RSP/EQE, Inc., a Washington corporation, Defendants,
City of Seattle, a Municipal Corporation, Petitioner.
No. 70704-9.
Supreme Court of Washington, En Banc.
Argued October 16, 2001.
Decided April 18, 2002.
*1234 Palmer Smith, Stanton Beck, Linda Clapham, Charles Willmes, Graham & Dunn, Stephen Goodman, Mark O'Donnell, Douglas Green, Seattle, for Defendants.
*1235 Marcia Nelson, Thomas Sheehan, Asst. Seattle City Attys., Seattle, for Petitioner.
Rand Koler, Kevin Ireland, Seattle, for Respondents.
CHAMBERS, J.
The 1515-1519 Lakeview Boulevard Condominium Association (homeowners) are the owners of three condominiums that were rendered uninhabitable when the soil underlying the property gave way precipitously during winter storms. The homeowners brought suit against several parties, including the City of Seattle (city). The homeowners argued the city should not have permitted the condominiums to be built due to the latent risk of soil movement, and that the city's storm drains had contributed to the slide. Before allowing the condominiums to be constructed, the city, concerned about the possibility of landslides, had imposed several conditions on the developer. These conditions included a covenant exculpating the city from liability for damages caused by soil movement. In this case, we are asked to determine whether an exculpatory covenant recorded in a deed runs with the land, and whether an action may be maintained against the city for alleged negligence in maintaining storm drains and granting permits. The trial court dismissed all claims against the city at summary judgment. The Court of Appeals agreed that the claims arising from permitting should be dismissed, but reinstated the claims arising from negligently maintained storm drains. We affirm the Court of Appeals dismissal of the negligent permitting claims (though on different grounds), affirm reinstatement of the claims relating to the storm drains, and remand for proceedings consistent with this opinion.

ISSUES
1. Does a covenant exculpating a city from liability for damages caused by soil movement run with the land?
2. Does a city have a duty to homeowners (1) to refuse to grant a building permit when there is a known risk of significant soil movement; or (2) to exercise due care to maintain a public drain system?

FACTS
This is the second case accepted for review by this Court (and the third where review was sought) arising out of the same unfortunate condominium project. These condominiums were built on a steep slope in between the city's Capitol Hill and Eastlake districts. The slope consists mostly of a permeable mixture of sand and fill resting on top of an impermeable mixture of silt and clay, a configuration that often leads to landslides.
Apartment Sales Corporation sought and received a permit from the city to build three townhouse condominiums on this site, 1515-1519 Lakeview Boulevard. The site consisted of a small, flat area and a steep slope running down to a section of freeway. Because the sites were in a potential slide area, the developers were required to obtain several zoning variances.
In addition to the variances, the city imposed three specific conditions before it would grant building permits. First, the developers were required to inform all purchasers of the risk of soil movement. Second, continuous insurance was required. Third, the developers were required to grant and record a covenant releasing the city from liability for damages caused by soil movement, except for damages caused by the city's sole negligence. The covenant reads in relevant part:
WHEREAS, the property is located in a "potential slide area" as defined in City of Seattle Director's Rule 2-87,[[1]] which rule requires as a condition of the issuance of land use and construction permits that this covenant be signed, acknowledged and recorded in the records of King County; NOW, THEREFORE, Owner(s) agree(s) as follows:
1. Owner(s) will inform his/her successors and assigns of the property described in Exhibit "A" that the property is in a potential slide area, of the risks associated with development *1236 thereon, of any conditions or prohibitions on development imposed by the City, and of any features in this design which will require maintenance or modification to address anticipated soils changes.
2. Owner(s) on his/her own behalf and on behalf of his/her heirs, successors and assigns hereby waives any right to assert any claim against the City for any loss, or damage to people or property either on or off the site resulting from soil movement by reason of or arising out of the issuance of the permit(s) by the City for development on this property except only for such losses that may directly result from the sole negligence of the City.
3. Requirements for continuous insurance as required by the permit authorizing the development.
Clerk's Papers (CP) at 44-45.
This covenant was referenced in the Preliminary Commitment for Title Insurance for the Fukuis, owners of 1515 Lakeview Boulevard. No documentation has been supplied on the other two units; however, the other homeowners do not dispute that it was properly recorded or that they had notice.
The homeowners received numerous assurances from the developers that the site was stable and the homes would not slip. The homeowners' complaint alleges they were assured the units would be safe, even if the soil slid away. Lakeview was flooded at least four times between November 1992 and November 1996. In each flood, at least a foot of water inundated the garages and basements of the units. Perhaps not coincidentally, the public storm drain system overflowed each time the condominiums flooded. The homeowners provided the declaration of an engineering geologist, Mackey Smith, which stated that failures of the city-maintained public drain system permitted thousands of gallons of water to inundate the condominiums. Smith also stated that these drain overflows were a contributing cause of the soil movement. There was other evidence of infrastructure failure: in November 1996 a city inspector discovered "the pipe leading from the manhole/catch basin of the former Lakeside Boulevard alignment had separated and was blocked.... This break was repaired." CP at 18.
In late December 1996, two severe storms dumped heavy snow onto soils already at or near saturation. Rain followed, saturating the snow because it could not penetrate frozen soil beneath. Then a warm rain quickly melted the saturated snow. Between December 30, 1996 and January 1, 1997 "temperatures rose rapidly and all of the snow was melted by intense warm air. The combination of saturated soil, freezing temperatures, and snow, followed by rapid thaw and warm rain, triggered widespread flooding and landslides throughout the Puget Sound region." CP at 265.
All three townhouses had been occupied about four years when the sites experienced significant soil movement. At approximately 6:00 a.m. on January 3, 1997, early rising homeowners in the Lakeview complex realized they had no running water. This was because the property had moved, breaking the connection with the water main. Water was "`bubbling out of the ground.'" CP at 19. Within a day, the property had sunk between four and six feet and had moved west two feet. The homes were rendered uninhabitable.
The homeowners sued the city, the developers, the geotechnical engineer, the architect, the contractor, and the structural engineer. The homeowners settled with the developers, and this Court ultimately dismissed the claim against the builders based on the statute of limitations. 1519-1525 Lakeview Blvd. Condo. Ass'n v. Apartment Sales Corp., 144 Wash.2d 570, 29 P.3d 1249 (2001). The city successfully moved for summary judgment based on the covenant, assumption of the risk, and the public duty doctrine. The homeowners appealed, and the Court of Appeals reversed. That court specifically found that the covenant did not run with the land, but found the negligent permitting claims were barred by the public duty doctrine. The Court of Appeals reinstated claims related to negligent maintenance of the storm drains. The city petitioned for review, which we granted.

*1237 ANALYSIS
This case is here on summary judgment presenting only questions of law. All questions will be reviewed de novo. Rivett v. City of Tacoma, 123 Wash.2d 573, 578, 870 P.2d 299 (1994).
A. Does the Exculpatory Language in the Deed Run With the Land?
1. Sovereign Immunity
We must first decide whether the abolition of sovereign immunity, RCW 4.96.010, is violated when a local government requires, as a condition of granting a building permit, an exculpatory covenant tailored to alleviate specific concerns unique to a particular project. We hold that exculpatory covenants do not categorically violate sovereign immunity. However, blanket grants of immunity secured routinely for performance of public functions do not differ meaningfully from ordinances immunizing local governments for their own negligence, and will be invalidated under Rivett, 123 Wash.2d 573, 870 P.2d 299, and Employco Pers. Servs., Inc. v. City of Seattle, 117 Wash.2d 606, 817 P.2d 1373 (1991). See also Howe v. Douglas County, ___ Wash.2d ___, 43 P.3d 1240 (2002). These issues will not be substantially revisited here.
The city contends innovative land use instruments, such as exculpatory covenants, should be encouraged because the Growth Management Act, chapter 36.70A RCW, is channeling development onto more and more marginal lots. The city is also concerned that if it denies building permits, it runs the risk of committing regulatory takings or inverse condemnation, as well as potentially frustrating the laudable goals of the Growth Management Act. The city argues that requiring the release and requiring the developers to have insurance and inform subsequent purchasers of the danger is a fair way to allow development. This argument suggests that property owners of land marginal for development because of the composition, topography, location, or other characteristic of the property should be free to propose creative solutions, and accept the risks of development.
We hold that a local government and a property owner may reach an arms length, bargained-for agreement which may include waivers of liability for risks created by the proposed use of property because of the shape, composition, location or other characteristic unique to the property sought to be developed. Here we find that the exculpatory language of the covenant was tailored to the specific risks presented by the proposed development of the property and appropriately limited in scope to the danger of soil movement. Therefore it does not violate this State's abolition of sovereign immunity by functionally enacting blanket immunity.[2]
2. Enforceability of the Covenant against Successive Owners
The homeowners argue that this covenant may not be enforced against them on the theory exculpatory waivers do not "run with the land" and therefore cannot bind successors in interest. Accordingly, we turn now to the requirements for a covenant to run.
Covenants are deeply rooted in our law, dating at least to the 14th century. Restatement (Third) of Prop: Servitudes: Introduction at 5 (2000). The seminal Spencer's Case, 77 Eng. Rep. 72 (Q.B.1583) established the general requirements. Spencer's Case involved a covenant by a tenant to build a wall. The tenant covenanted on behalf of himself and his executors, administrators, and assigns to build a brick wall on a leased lot. After executing the covenant, the tenant assigned the property to another. The new tenant refused to build the wall. "Although there is some doubt from the report as to who won, the case is famous because the judges laid down three propositions about the running of the burden of covenants." Jesse Dukeminier *1238 & James E. Krier, Property 856 (3d ed.1993). There must be intent to bind successors, the obligation must touch and concern the land, and there must be privity of estate.[3]Id. Otherwise, the "covenant" is merely a contract and will not bind future possessors of the land. William B. Stoebuck, Running Covenants: An Analytical Primer, 52 Wash. L.Rev. 861, 863-64 (1977). Through much of their history, the requirements for a covenant to run varied depending on whether it was "real" (developed and enforced in courts of law) or "equitable" (developed and enforced in the Chancery). However, the distinctions have largely vanished from our law. See Hollis v. Garwall, Inc., 137 Wash.2d 683, 690, 974 P.2d 836 (1999).
Generally, there are five elements required for a covenant to run:
(1) a promise which is enforceable between the original parties; (2) which touches and concerns; (3) which the parties intended to bind successors; and (4) which is sought to be enforced by an original party or a successor, against an original party or a successor in possession; (5) who has notice of the covenant or has not given value.
Stoebuck, supra, at 909-10. Four of these elements are not seriously disputed by the parties before this Court. The issue before us is whether an exculpatory covenant touches and concerns the land.[4]
Professor Stoebuck noted:
If there ever was a rule that a running covenant had to touch and concern land in a physical sense, it has long since been abandoned in America. The most that can be said concerning American doctrine is that the meaning of touch and concern tends to become less clear as physical contact becomes less direct.
Stoebuck, supra, at 870 (footnote omitted). This Court has not adopted a strict test for "touch and concern," instead we have established an analytical approach:
"Generally speaking, a covenant touches or concerns the land if it is such as to benefit the grantor or the lessor, or the grantee or lessee, as the case may be. As the term implies, the covenant must concern the occupation or enjoyment of the land granted or demised and the liability to perform it, and the right to take advantage of it must pass to the assignee. Conversely, if the covenant does not touch or concern the occupation or enjoyment of the land, it is the collateral and personal obligation of the grantor or lessor and does not run with the land."
Rodruck v. Sand Point Maint. Comm'n, 48 Wash.2d 565, 574-75, 295 P.2d 714 (1956), (quoting City of Seattle v. Fender, 42 Wash.2d 213, 254 P.2d 470 (1953) (quoting Pelser v. Gingold, 214 Minn. 281, 8 N.W.2d 36 (1943))). It is an open question whether a covenant warning of risk and exculpating liability for that risk touches and concerns the land. The only court to reach whether such covenant would run held, without analysis of touch and concern, that it did run. Phillips v. Altman, 1966 OK 46, 412 P.2d 199 (holding that a covenant not to sue for damages arising from oil and gas pollution ran with the land and was not void as against public policy).
The city relies upon Hollis, 137 Wash.2d at 690, 974 P.2d 836 to support an argument that this Court has abandoned the requirement of "touch and concern." Hollis does not extend so far. Hollis was limited to mutual covenants in a subdivision. The requirements for covenants running in subdivisions have been relaxed compared to covenants running in other contexts; it is even possible for covenants to be enforced against those who have no covenant appearing on their title. See Stoebuck, supra, at 908-10; *1239 see also 17 William B. Stoebuck, Washington Practice, Real Estate: Property Law § 3.2, at 127-28 (1995). Further, this Court was not considering in Hollis generalized rules governing covenants; instead, the argument focused on whether the liberalized parole evidence rule of Berg v. Hudesman, 115 Wash.2d 657, 801 P.2d 222 (1990) applied to covenants. This Court has not relaxed the touch and concern requirement for the enforceability of covenants in settings other than subdivisions and we decline to do so now.
We conclude that this covenant satisfies the touch and concern doctrine as used in this State. Read as a whole, the covenant burdens the use of land, since the covenant is limited to the reasonable enjoyment of the land and limits rights normally associated with ownership. Further, few things touch and concern land more than the soil itself. This is sufficient to meet the requirements of Rodruck. The city is exculpated for losses that are not caused by the city's own negligence arising from soil movement, as reasonably contemplated by the parties to the covenant. Therefore, we hold that this covenant runs with the land.

NEGLIGENCE[5]
A. Negligent Permitting Claim
While not raised to this Court, given our disposition of the issues we will briefly address whether the city, when granting a permit to the developers, had a duty to future homeowners enforceable in tort. We hold it did not. Alleged negligent permitting alone cannot be the basis of a negligence claim against local government, absent a recognized exception. See Howe, ___ Wash.2d ___, 43 P.3d 1240; Taylor v. Stevens County, 111 Wash.2d 159, 759 P.2d 447 (1988). Homeowners have not established that they fall within a recognized exception. Therefore, we affirm both the trial court and the Court of Appeals dismissal of this claim.
B. City's Duty to Maintain Drainage System
The trial court dismissed the negligent maintenance claims against the city, finding they were barred by the public duty doctrine. The trial court granted summary judgment to the city on this claim. The Court of Appeals reversed.
The homeowners contend the city's storm drain system had been negligently maintained, and that negligence proximately caused the land to slide. They pleaded facts tending to show that they fall within the "special relationship" exception to the public duty doctrine. To fall within the special relationship exception on their negligent maintenance claim, the homeowners must establish: "(1) there is direct contact or privity between the public official and the injured plaintiff which sets the latter apart from the general public, and (2) there are express assurances given by a public official, which (3) gives rise to justifiable reliance on the part of the plaintiff." Taylor, 111 Wash.2d at 166, 759 P.2d 447.
The homeowners also contend that negligent maintenance occurred both to the drainage system on the developed site and off of the developed site. According to the homeowners, the drainage system for the Lakeview property had two components: foundation drains channeling water from the foundation area into a storm sewer system, and lines conducting water from the downspouts off site. The homeowners submitted facts tending to show that the drainage system was built so that it was not tightly lined into the storm sewer system but connected to an infiltration gallery. Instead of taking the surface water away from the site, it introduced the water to the area of the foundation. The defective drainage system was apparently buried before it was inspected by a representative of the city.
The Fukuis filed a claim with the city for flood damage, and were compensated. Aware of the drainage problems, the city installed catch basins in front of the Fukui residence. Ms. Fukui submitted an affidavit *1240 saying she relied on assurances from the city that it would maintain the storm drains. She has demonstrated, sufficient to defeat a claim for summary judgment, direct contact, express assurances, and justifiable reliance. She falls within the special relationship exception with regards to damages occasioned by actual negligence in maintaining the storm drain system. Therefore, we affirm the Court of Appeals reversal of the trial court's dismissal of this claim and remand for further proceedings consistent with this opinion.[6]

CONCLUSION
In summary, we conclude the city is not liable for negligently granting a permit to build on this site. We also hold the exculpatory covenant is valid to the extent it releases the city from liability resulting from soil movement "resulting from ... the issuance of the permit." The covenant does not, and may not, exculpate the city for soil movement-related losses caused by the city's own negligence. The homeowners may pursue claims against the city arising out of negligent maintenance of the storm and water drain system. Accordingly, we reverse in part, affirm in part, and remand for further proceedings consistent with this opinion.
ALEXANDER, C.J., SMITH, JOHNSON, MADSEN, SANDERS, IRELAND, BRIDGE, OWENS, JJ., concur.
NOTES
[1] No argument about the constitutionality or legality of this rule was made at any level; nor was any argument made about the appropriateness of covenants in the land use planning.
[2] By its terms, this covenant does not exculpate the city for losses caused by its "sole negligence." Below, the city argued that any contributing cause other than its sole negligence would exculpate the city totally. Arguably, the city is advancing conditional sovereign immunity, but this issue was not raised to this Court, and so we will make no ruling on it.
[3] Equitable covenants date back to 1848. Tulk v. Moxhay, 2 Phillips 774, 41 Eng. Rep. 1143 (1848). Equitable covenants have a looser privity requirement. See Jesse Dukeminier & James E. Krier, Property 864 (3d ed.1993).
[4] The recently published Restatement (Third) of Property has abolished "touch and concern" as an element of enforceable covenants. In its stead, the Restatement provides that a servitude is valid unless it is illegal, unconstitutional, or violates public policy. Restatement (Third) of Prop: Servitudes § 3.1 (2000). Whether this Court should adopt the Restatement was not raised until the motion for reconsideration to the Court of Appeals opinion, and will not be considered for the first time on review to this Court.
[5] The city has argued below that the covenant should function as an express assumption of the risk. Given our disposition of the case, we decline to reach this argument.
[6] We note a dispute in the briefs about whether competent evidence has been presented to establish the alleged negligence of the city caused the damage to the homeowners. Neither the trial court nor the Court of Appeals considered this issue. Given our disposition of the issues, we decline to consider it.