568

[No. 30681-0-III.   Division Three.   February 14, 2013.]

RIVERVIEW COMMUNITY GROUP, *Appellant*, v. SPENCER & LIVINGSTON ET AL., *Respondents*.

570

*David P. Boswell* (of *Boswell Law Firm PS*), for appellant.

*David A. Kulisch*; *David S. Mann* (of *Gendler & Mann LLP*); and *Brendan W. Donckers* (of *Breskin Johnson & Townsend PLLC*), for respondents.

¶1 KORSMO, C.J. — The Riverview Community Group, a collection of adjoining and neighboring property owners acting as a nonprofit corporation, sued its property's developers for closing the golf course that had been the center of their development and sought to have the golf course reopened. The trial court directed that all of the area's individual landowners be joined as necessary parties to the litigation under CR 19. The court also granted summary judgment and dismissed the action on the basis that equitable servitudes were not available in Washington unless created in writing. We reverse the court's CR 19 ruling but affirm the summary judgment order.

## FACTS[1]

¶2 This litigation is centered on a 540-acre development in northern Lincoln County near the confluence of the

---

[1] Because this matter was resolved on summary judgment, we view the facts in a light most favorable to the appellants. We note that the defendants do not agree with all of the assertions, particularly those concerning representations made in

Spokane River and Lake Roosevelt. The property was developed by two married couples, George and Sheila[2] Livingston, and Charles and Gloria Spencer. They created the general partnership of Spencer & Livingston in 1987. The partnership filed Deer Meadows Plat 1 in 1990. Two years later they filed a replatted Plat 1 in conjunction with Deer Meadows Plat 2.

¶3 A 9-hole golf course opened on the development in 1994; four years later the course expanded to 18 holes. The golf course eventually would include a pro shop, bar, lounge, and motel. In September 1994, after the golf course had opened, James Linville purchased a lot from the Spencers and Livingstons across from the course. In December 1994, the Spencers and Livingstons created Deer Meadows Inc. (DMI). In February 1995 the partnership's assets were transferred to DMI. Nonetheless, the partnership recorded Deer Meadows Plat 3 in July 1995. This plat map was the only one that noted the presence of a golf course. In September 1995, DMI quitclaimed its assets back to the partnership, which promptly quitclaimed the real estate contracts to Charles Spencer individually. DMI dissolved in December 1995.

¶4 Charles Spencer created Deer Meadows Golf Inc. (DMG) in November 1995. At some later time DMG obtained ownership of the golf course. In March 1996 Mr. Spencer transferred some real estate contracts to DMG. That same month he created Deer Meadows Development and transferred additional real estate contracts to it the following month.[3] In June 1996, Howard Walker purchased from the Livingstons a lot in Deer Meadows Plat 1 overlooking the golf course.

---

the course of the sale of the individual lots. The limited discovery in the case also leaves some of the factual history undeveloped in this record.

[2] Some of the deeds identify the sellers as George and Lura L. Livingston. The record does not identify Lura Livingston.

[3] Deer Meadows Development later dissolved at some unknown date.

¶5 Spencer and Livingston formed S.O.S. LLC (SOS) in February 1997 to develop the nearby Deer Heights area. SOS recorded Deer Heights Plat 1 in September 1998. SOS would file Deer Heights Plat 2 in 2000 and Deer Heights Plat 3 in 2003. The general layout of the development by this time had the Deer Meadows properties adjoining and nearly surrounding the golf course, with the Deer Heights lots north of the course.

¶6 Ken Sweeney purchased a lot in Deer Heights from SOS in May 1999. The following year he would swap the lot with Charles Spencer for a lot on the 13th hole of the golf course. In August 1999, James Kerlee purchased a lot abutting the golf course from the Livingstons.

¶7 Charles Spencer passed away January 22, 2005. Mr. Livingston took control of DMG later that year. In May 2006 Mr. Livingston sold a lot on the eighth hole to Mark Jensen.

¶8 The golf course closed in 2009, and its equipment was sold the following year. DMG became inactive in March 2010. The Riverview Community Group was formed in September 2010 as a nonprofit corporation. As many as 100 of the nearly 500 area property owners joined Riverview, including the five property owners noted previously: James Linville, Howard Walker, Ken Sweeney, James Kerlee, and Mark Jensen. Each of the five alleged that the property had been marketed to them as a "golf course community" and presented promotional materials to that effect that they had received.[4] Some of them reported representations by various real estate agents, including Gloria Spencer, that the golf course land would not be further developed and would remain an 18-hole golf course. They also asserted that they could not afford to litigate the claims individually but desired to do so through Riverview.

---

[4] In its memorandum decision, the trial court viewed the plaintiff's evidence as supporting a claim that the defendants "marketed the development as a golf course community, and represented to potential buyers that the golf complex would remain in continuous operation." Clerk's Papers at 206.

¶9 Riverview filed suit in its own name in March 2011, seeking declaratory and injunctive relief, as well as equitable relief in the form of recognition of equitable servitudes that required restoration of the golf course. The named defendants included George and Sheila Livingston, the Spencer & Livingston partnership, and SOS, along with some of the defunct earlier corporations. The Livingstons and the partnership (collectively Livingstons) were represented by different counsel than SOS.

¶10 The Livingstons moved for dismissal pursuant to CR 12(b)(7), arguing that Riverview had not joined necessary parties under CR 19 and that Riverview itself had no interest in the litigation since it was formed after the golf course had been shuttered. The trial court agreed with the motion and ruled that the individual Deer Meadows property owners were necessary parties. It ordered Riverview to join the owners as parties or receive assignments from them within a reasonable period of time. Clerk's Papers (CP) at 246.

¶11 SOS moved for summary judgment, and the Livingstons subsequently joined the motion. SOS argued that equitable servitudes were not available in Washington unless they had been created in a written document. Remarking that existing case law supported the argument that implied equitable servitudes did not exist in Washington, the court granted the motion. A written order dismissing the case as to all defendants was entered.

¶12 Riverview promptly appealed to this court.

## ANALYSIS

¶13 Riverview argues in this appeal that it has standing, there is no need to add the individual property owners as additional parties, and implied equitable servitudes can be imposed in Washington. We will treat the first two arguments as one issue before addressing the equitable servitudes argument.

### Organizational Standing and Real Party in Interest

¶14 Although the issue was not argued below, Riverview initially argues that it has organizational standing to pursue this action in accordance with *International Association of Firefighters, Local 1789 v. Spokane Airports*, 146 Wn.2d 207, 45 P.3d 186 (2002) (*Firefighters*). It also argues in rebuttal that the trial court erred in ordering the addition of individual landowners as parties. Respondents contend that Riverview lacks standing and is not a real party in interest, and that the landowners were CR 19 indispensable parties who were not joined. These issues, although analytically distinct, are intertwined; we will address the CR 17 and standing issues together before addressing the CR 19 argument.

¶15 CR 17(a) provides in part:

> Every action shall be prosecuted in the name of the real party in interest. . . . No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest.

■ ■ ¶16 The concepts of standing and CR 17(a) real party in interest are often interchanged by our courts. Philip A. Trautman, *Joinder of Claims and Parties in Washington*, 14 Gonz. L. Rev. 103, 109 (1978). Standing refers to the demonstrated existence of "an injury to a legally protected right."[5] *Sprague v. Sysco Corp.*, 97 Wn. App. 169, 176 n.2, 982 P.2d 1202 (1999). "The real party in interest is the person who possesses the right sought to be enforced." *Id.*

¶17 The essence of this case is promissory estoppel—the alleged breaking of a promise, made via promotional brochures and express statements by the developers, to main-

---

[5] Standing is a jurisdictional issue that can be presented initially on appeal. *Firefighters*, 146 Wn.2d at 212 n.3.

tain a golf course. The persons who purchased land in the development in reliance upon that promise are the ones who have been injured.[6] The existence of an injury is the dispositive factor driving the analysis of these related issues. With that focus in mind, we agree that Riverview is a real party in interest with standing.

¶18 Riverview argues that it is an appropriately incorporated nonprofit organization in accordance with chapter 24.03 RCW interested in the continuation of the golf course at Deer Meadows. One of the powers of a nonprofit organization is the ability to sue and be sued. RCW 24.03.035(2). Because some of its individual members have claims against the defendants and desire to litigate those claims through Riverview, the group claims organizational standing under the decision in *Firefighters*. We agree.

¶19 In *Firefighters*, a union embroiled in a dispute over return of Social Security payments made on behalf of its members sought to have the employer refund to each union member the matching payments made on the member's behalf. This court concluded that standing existed for the union to seek the refunds for its individual members. 146 Wn.2d at 210-11. The Washington Supreme Court agreed.[7] The court first noted the general rule that organizations lacked standing to seek damages for their individual members where the organization had not been harmed or had not received an assignment of claims. *Id.* at 213. The court also noted the three criteria for granting an organization standing:

(1) the members of the organization would otherwise have standing to sue in their own right; (2) the interests that the

---

[6] The five elements of promissory estoppel are "(1) a promise (2) which the promisor should reasonably expect will cause the promisee to change position and (3) which actually causes the promisee to change position (4) in justifiable reliance on the promise, so that (5) injustice can be avoided only by enforcement of the promise." *Shaw v. Hous. Auth.*, 75 Wn. App. 755, 761, 880 P.2d 1006 (1994).

[7] Three members of the court dissented on two other grounds and did not discuss standing. 146 Wn.2d at 225-36 (Madsen, J., dissenting).

organization seeks to protect are germane to its purpose; and (3) neither claim asserted nor relief requested requires the participation of the organization's individual members.

*Id.* at 213-14.

¶20 The first two criteria satisfy the "case and controversy" requirements of the federal constitution. *Id.* at 215. The third criterion, the necessary participation of the organization's individual members, is judicially imposed and exists for the convenience of the courts. *Id.* The third criterion is typically the basis for courts declining to permit organizations to assert damages on behalf of their members since normally those members would have to be actively involved in establishing their individual damages. *Id.* at 214-15. Thus, where the individual members have to participate, there frequently is no need for an association to do so.

¶21 The *Firefighters* court decided that there are instances where lack of individual participation should not prevent organizational standing "because the amount of monetary damages sought on behalf of those members is certain, easily ascertainable, and within the knowledge of the defendant." *Id.* at 215-16. Because those standards were met in *Firefighters*, individual participation was not necessary and the union had standing to assert the damages owed its members. *Id.* at 217.

¶22 The Washington Supreme Court reaffirmed *Firefighters* in *Five Corners Family Farmers v. State*, 173 Wn.2d 296, 268 P.3d 892 (2011). There a nearby water rights holder (Mr. Collin), two local nonprofit organizations, and the Sierra Club challenged the transfer of a senior water right to a large cattle feedlot owner, seeking both declaratory and injunctive relief. *Id.* at 300-01. The court unanimously[8] agreed that all of the groups had standing. The majority began its standing discussion by noting that Mr. Collin, as a nearby water rights holder, had personal

---

[8] The dissent began by agreeing that the appellants had standing. 173 Wn.2d at 315-16 (Wiggins, J., dissenting).

standing. *Id.* at 303-04. It also noted that Mr. Collin was a member of both local nonprofit groups. *Id.* at 304. After citing the *Firefighters* elements for organizational standing, the opinion noted:

> Collin's standing and his membership support standing for Five Corners Family Farmers and CELP [the Center for Environmental Law and Policy]. Sierra Club has established a genuine issue of material fact as to whether there is a reasonable probability that withdrawals of groundwater will impact its members' specifically alleged concrete interest in recreational use of surface waters. These issues are all germane to purposes of the organizations seeking standing, and the claims and relief sought do not require participation by individual members.

*Id.* at 304.

¶23 In light of the broad reading of the *Firefighters* test in *Five Corners*, we agree that Riverview has standing here. Five of its members filed declarations establishing their apparent standing. That is four members more than the one person who was sufficient to give organizational standing to two groups in *Five Corners*. Riverview has standing to pursue this action.

¶24 Those same facts defeat the CR 17 real party in interest argument. The rule expressly permits a reasonable time "for ratification of commencement of the action by" a real party in interest. CR 17(a). That was done here. The five Riverview members with standing have all declared their desire that the case be conducted by Riverview. That is sufficient to establish "ratification of commencement of the action." The CR 17 objection is without merit.

### CR 19 Joinder of other Landowners

¶25 The trial court's ruling required joinder of the "Deer Meadows landowners" as parties. It is unclear if the ruling means all of the Deer Heights area property owners are

included in this order.[9] We nonetheless conclude that the individual property owners in the development are not essential parties to this litigation.

¶26 CR 19 addresses joinder of parties. CR 19(a) describes those parties who should be joined, while CR 19(b) discusses what courts must do if it is not possible to join parties. Those rules state:

(a) **Persons To Be Joined if Feasible.** A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (A) as a practical matter impair or impede his ability to protect that interest or (B) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action.

(b) **Determination by Court Whenever Joinder Not Feasible.** If a person joinable under (1) or (2) of section (a) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: (1) to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; (2) the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; (3)

---

[9] In its memorandum ruling, the court used the term "Deer Meadows" to refer to the entire development. CP at 206. It did not define the term in its order. CP at 246.

whether a judgment rendered in the person's absence will be adequate; (4) whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

¶27 Although a trial court's CR 19 decision is reviewed for abuse of discretion, dismissal under CR 12(b)(7) is a "drastic remedy" that "should be employed sparingly." *Gildon v. Simon Prop. Grp., Inc.*, 158 Wn.2d 483, 494, 145 P.3d 1196 (2006). Discretion is abused when it is exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). An indispensable party is one who is both necessary to the litigation in the sense that relief cannot be afforded without the party and it would be inequitable to proceed without the absent party. *Auto. United Trades Org. v. State*, 175 Wn.2d 214, 221-23, 235, 285 P.3d 52 (2012) (*AUTO*). A plaintiff is not required to join additional parties whose presence would be permissive rather than essential to the litigation. *Jensen v. Arntzen*, 67 Wn.2d 202, 207, 406 P.2d 954 (1965) (undisclosed principal was not an indispensable party in suit against his agent).

¶28 CR 19(a) identifies two classes of parties that should be joined if feasible. The first class is a party whose presence is necessary to afford the existing parties complete relief. CR 19(a)(1). The other class is a party who "claims an interest" in the proceeding and either that party's interest might be adversely affected by the litigation or an existing party could be subject to inconsistent judgments if the party is not added. CR 19(a)(2).

¶29 The trial court's memorandum decision focused on two factors: (1) the court could not provide relief to the real parties in interest, the individual landowners, since Riverview had no interest in the land and (2) the defendants might be subject to multiple suits and inconsistent rulings if the other landowners were not parties. CP at 212. Neither concern makes the individual landowners indispensable parties.

¶30 The trial court's analysis of the first factor revolved around both the fact that Riverview did not own any land in the development and that the requested relief would benefit landowners who were not parties to the case. The former concern is a CR 17 issue that we have already discussed. The second concern is misplaced under CR 19(a)(2). An absent party is necessary under that subsection of the rule if the party "claims an interest relating to the subject of the action" and "the disposition of the action in his absence may . . . as a practical matter impair or impede his ability to protect that interest." CR 19(a)(2)(A). Whether or not any of the absent landowners have claimed, or could claim, an interest in the litigation, the resolution of Riverview's action will not impair their interests. If successful, Riverview arguably could benefit those landowners, but an unsuccessful action would not burden or otherwise harm them. While the absent landowners might benefit from being involved in the litigation, it does not appear that their interests would be harmed if they do not appear; rather, the status quo would simply be maintained. They are not essential parties to this litigation.

¶31 The second factor analyzed by the trial court concerned whether the respondents would be denied the res judicata benefits of a successful defense of this case if the absent landowners were not added. CR 19(a)(2)(B). That is not the case for the Riverview members. Being in privity with the organization, they are bound by any ruling in the case. *Stevens County v. Futurewise*, 146 Wn. App. 493, 503-04, 192 P.3d 1 (2008).[10] Thus, the respondents would have the benefit of res judicata if sued by a Riverview member in the future.

¶32 The nonmember landowners present a different issue. While respondents would understandably desire to

---

[10] In addition to identity of parties, the other elements of res judicata are the subject matter, the cause of action, and the quality of the persons for or against whom the claim is made. *Futurewise*, 146 Wn. App. at 503. None of those elements are at issue here. An attempt by any Riverview member to file new litigation over the golf course would be subject to res judicata.

have every potential plaintiff joined in one case, they have identified no authority that requires all potential parties be joined. In cases of multiple potential claimants, there is always a risk that a defendant will face multiple lawsuits. That possibility does not require that every potential plaintiff be joined in one action but is simply inherent in situations where multiple people have been damaged. A plaintiff is not deprived of his day in court just because another potentially aggrieved person decides not to pursue litigation.

¶33 It also is highly unlikely that every nonmember landowner in Deer Meadows and Deer Heights has the same interest as Riverview's members in the continued existence of the golf course. The development is located in a desirable vacation area, and it is very likely that there were as many boaters and outdoor recreational enthusiasts in the development who were attracted by its proximity to Lake Roosevelt as there were people who sought a golf community. Even among the other golf enthusiasts in the community, there likely are some who did not receive express promises that the golf course would remain open. There also may be other landowners who believe a promise was breached but are more interested in recovering damages than seeking return of the golf course.[11] In short, the remaining landowners simply may not have any reason or ability to seek the equitable relief Riverview is seeking. At a minimum, the defendants have not shown that the nonmember property owners have "an interest relating to the subject of the action" that would give rise to a res judicata expectancy that could be protected by CR 19(a)(2). It was their burden to do so. *AUTO*, 175 Wn.2d at 222.

¶34 In many respects, this case is similar to *Crosby v. Spokane County*, 137 Wn.2d 296, 971 P.2d 32 (1999). There landowners sought to challenge a zoning change request for

---

[11] The statute of limitations likely has run or soon will run on most claims arising from the 2009 closure of the golf course, making future claimants even less likely.

adjoining property and were permitted to intervene at the administrative level. The developers appealed via a writ action and failed to include the intervenors among the parties. The superior court determined that the intervenors were indispensable parties and granted the developer's motion to join them, but nonetheless dismissed the action because joinder had not been accomplished within the statute of limitations period. *Id.* at 300. When it reviewed that aspect of the case, a majority[12] of the Washington Supreme Court reversed the determination that the neighboring landowners were necessary to the action:

> Respondents-landowners do not have such an interest. They are property owners whose neighborhood may be affected by plat approval because a subdivision would be built. They are also the persons who obtained reversal of the Committee's grant of the plat application. However, they are not the persons whose property is the subject of the land use decision at issue. This is a crucial distinction in this statutory writ proceeding.

*Id.* at 308.

¶35 Similarly here, the other Deer Meadows and Deer Heights property owners may be affected in a positive manner by the outcome of the Riverview litigation. However, they are not essential to that litigation because their land is not the land in question—the golf course land is at issue, not that of the neighbors. Whether or not all of those neighbors have equitable rights that might accrue to their land, they are not essential parties to this litigation. The trial court lacked tenable grounds for ruling otherwise.

¶36 The court erred in directing the joinder of all the neighboring property owners.

*Equitable Servitudes*

¶37 The trial court dismissed this action at summary judgment on the basis that implied equitable servitudes are

---

[12] The four dissenters thought that the neighbors were indispensable parties but agreed that dismissal for failure to timely join them was not an appropriate remedy. 137 Wn.2d at 318-19 (Talmadge, J., dissenting).

not an available equitable remedy in Washington. We disagree but nonetheless affirm.

¶38 Well settled standards govern our review of summary judgment rulings. An appellate court reviews a summary judgment de novo; our inquiry is the same as the trial court. *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000). The facts, and all reasonable inferences to be drawn from them, are viewed in the light most favorable to the nonmoving party. *Id.* If there is no genuine issue of material fact, summary judgment will be granted if the moving party is entitled to judgment as a matter of law. *Id.*; *Trimble v. Wash. State Univ.*, 140 Wn.2d 88, 93, 993 P.2d 259 (2000).

¶39 Respondents argue that implied servitudes are contrary to existing Washington law and that the trial court correctly dismissed this action as a matter of law. Riverview contends that the issue is open and urges us to adopt the position of *Restatement (Third) of Property* (2000),[13] which uses the same fact pattern as an example of an equitable servitude. While Washington has not addressed this issue in some time, we do not believe this is an open issue and have no reason to adopt the *Restatement*.

¶40 "A servitude is a legal devise that creates a right or obligation that runs with the land." *Lake Limerick Country Club v. Hunt Manufactured Homes, Inc.*, 120 Wn. App. 246, 253, 84 P.3d 295 (2004) (following *Restatement*). Our statute of frauds requires contracts for the sale or lease of real property to be in writing. *Pardee v. Jolly*, 163 Wn.2d 558, 566-67, 182 P.3d 967 (2008) (sales agreement); *Powers v. Hastings*, 93 Wn.2d 709, 711 n.1, 612 P.2d 371 (1980) (lease). Washington's codification of that requirement is found in RCW 64.04.010, which states in relevant part, "Every conveyance of real estate, *or any interest therein*, and every contract creating or evidencing any encumbrance

---

[13] We will refer to the *Restatement (Third) of Property* (2000) simply as the *Restatement*.

upon real estate, shall be by deed." (Emphasis added.) The broad language of the statute, reaching *any* encumbrance, also applies to easements and other lesser interests in realty. *E.g.*, *Berg v. Ting*, 125 Wn.2d 544, 886 P.2d 564 (1995) (easement).[14]

¶41 Respondents, accordingly, argue that there is no writing evidencing the intent to maintain the golf course for the benefit of the neighboring property owners and that without such a writing, there can be no equitable restriction on their land. They rely upon the test regularly stated in our case law:

> The elements which are necessary for finding an equitable restriction in the subdivision setting are: (1) a promise, in writing, which is enforceable between the original parties; (2) which touches and concerns the land or which the parties intend to bind successors; and (3) which is sought to be enforced by an original party or a successor, against an original party or successor in possession; (4) who has notice of the covenant.

*Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 691, 974 P.2d 836 (1999); *accord 1515-1519 Lakeview Blvd. Condo. Ass'n v. Apartment Sales Corp.*, 146 Wn.2d 194, 203, 43 P.3d 1233 (2002) (*Lakeview*).[15]

¶42 Riverview, in contrast, relies upon an example from the current *Restatement* on the creation of a servitude by a golf course developer:

> P bought a lot abutting a golf course in a residential subdivision. The developer, who owned the golf. course, represented

---

[14] However, there are numerous exceptions to the statute where Washington recognizes various interests in property without the formality of a writing. *E.g.*, *Lamm v. McTighe*, 72 Wn.2d 587, 434 P.2d 565 (1967) (recognizing in boundary disputes the doctrines of adverse possession, parol agreement, estoppel in pais, location by common grantor, and mutual recognition and acquiescence); *Kirk v. Tomulty*, 66 Wn. App. 231, 831 P.2d 792 (1992) (quieting title to an easement).

[15] The test cited in *Hollis* and *Lakeview* is not a test for creating covenants. Rather, it is Professor Stoebuck's test for interpreting whether an existing covenant is capable of binding successors in interest. *Hollis*, 137 Wn.2d at 691 (citing William B. Stoebuck, *Running Covenants: An Analytical Primer*, 52 WASH. L. REV. 861, 909-10 (1977); *Lakeview*, 146 Wn.2d at 203 (citing Stoebuck, *supra*, at 863-64).

that the golf course would be subject to restrictions that would ensure its maintenance as a golf course for 50 years. Sales brochures for the subdivision showed pictures of the golf course and stated that all residents would have access to golf-club memberships. The developer now plans to discontinue the golf course and build apartment houses on the golf course. Giving effect to the oral representation would be justified. Given the existence of the golf course, the specificity of the representations, the brochures, and the likely expectation of residential purchasers that their deeds would not reflect the developer's obligations with respect to the golf course, their reliance was reasonable.

RESTATEMENT § 2.9 illus. 10.

¶43 *Hollis* notes that there "are essentially two kinds of covenants that run with the land—real covenants and equitable covenants." 137 Wn.2d at 691. However, "Washington cases have generally not distinguished between the two kinds of covenants." *Id.* The term covenant is used modernly to describe " 'promises relating to real property that are created in conveyances or other instruments.' " *Id.* at 690-91 (quoting 9 RICHARD R. POWELL, POWELL ON REAL PROPERTY § 60.01[2], at 60-5 (1998)).[16]

¶44 The conflation of real and equitable covenants in Washington normally has been of no concern because the issue in most reported cases typically has been interpretation of whether or not the covenant attached to the land. *E.g.*, *Lakeview*, 146 Wn.2d 194; *Metzner v. Wojdyla*, 125 Wn.2d 445, 886 P.2d 154 (1994); *Mains Farm Homeowners Ass'n v. Worthington*, 121 Wn.2d 810, 854 P.2d 1072 (1993); *Rodruck v. Sand Point Maint. Comm'n*, 48 Wn.2d 565, 295 P.2d 714 (1956); *Lake Limerick*, 120 Wn. App. 246; *Mountain Park Homeowners Ass'n v. Tydings*, 72 Wn. App. 139, 864 P.2d 392 (1993), *aff'd*, 125 Wn.2d 337, 883 P.2d 1383

---

[16] The terms "real covenant" and "restrictive covenant" are used interchangeably in our case law. *E.g.*, *Bloome v. Haverly*, 154 Wn. App. 129, 225 P.3d 330 (2010); *Deep Water Brewing, LLC v. Fairway Res. Ltd.*, 152 Wn. App. 229, 215 P.3d 990 (2009); *Dickson v. Kates*, 132 Wn. App. 724, 133 P.3d 498 (2006).

(1994); *Leighton v. Leonard*, 22 Wn. App. 136, 589 P.2d 279 (1978). In other words, the cases seldom address how a covenant is created and instead address whether or not the covenant is effective and/or binding on other parties.

¶45 This case, however, raises the question of whether a covenant running with the golf course property has been created because of behavior rather than by mutual intent expressed in writing. Courts acting in equity have broad remedial authority to effect appropriate relief, even in cases involving real property. *Proctor v. Huntington*, 169 Wn.2d 491, 500-03, 238 P.3d 1117 (2010).[17]

¶46 Our early case involving an equitable covenant is *Johnson v. Mt. Baker Park Presbyterian Church*, 113 Wash. 458, 194 P. 536 (1920). There a developer in the Mount Baker region of Seattle had platted, mapped, advertised, and sold lots in the development of an upscale residential neighborhood in which nothing could or would be built but houses. *Id.* at 459-61. Nearly all of the deeds[18] in the neighborhood included restrictions setting the minimum cost at which each house had to be constructed and limiting structures that could be built on the land to a single detached residence. *Id.* at 460. These assurances and re-strictions increased the price of the lots by 15-20 percent. *Id.* at 461. However, a congregation bought a lot in the development that did not contain the restrictive covenant and sought to erect a church in the neighborhood. *Id.* The plaintiffs obtained an injunction, and the church appealed. *Id.* at 462.

¶47 The church argued that it was not bound by the same restrictive covenants as the other property owners because the statute of frauds required all use restrictions

---

[17] Discussing the holding of an earlier property line dispute, the *Proctor* majority noted that "a court's equity power transcends the mechanical application of property rules." 169 Wn.2d at 501.

[18] All but 4 or 5 of the 650 lots sold in the development contained the residential restriction. The other lots were sold to the school district and the fire department, and for community storage and meetings. 113 Wash. at 460, 471.

on real property to be in writing. *Id.* The Supreme Court partially agreed with that argument, saying that if the plaintiff was seeking relief under the claimed property interest or encumbrance upon the land, then the statute of frauds would require a written covenant. *Id.* at 464. But, when the relief sought arises out of equity, then the statute of frauds does not apply as it is "immaterial whether they have any interest or easement in appellant's property." *Id.* at 464-65. The court went on to say:

> There is a wide difference between actual legal ownership of an interest or easement in the real estate of another, and the right, because of equitable principles, to demand that property of that other shall be used only in a certain manner. The one right is based on partial legal title, while the other is based on conduct, representations and acts which in justice, between man and man, may not be repudiated.

*Id.* at 466.

¶48 Although old, *Johnson*'s holding has never been questioned. Professor Stoebuck calls it the leading case in Washington on implied restrictions, with "an express holding that an implied covenant in a subdivision need not comply with the Statute of Frauds." 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 3.11, at 510 (2d ed. 2004). Thus, to the extent that the trial court concluded that Washington did not recognize equitable covenants, we disagree. The remaining question, however, is whether Riverview established that it was entitled to an equitable covenant here.

¶49 Respondents argue that *Johnson* did involve a written restriction, unlike this case, and therefore is inapposite here where there is no written scheme creating restrictions on the land in the development. While this argument undercuts the trial court's broad equitable powers to fashion relief, it is consistent with the language of our statute of frauds. Nonetheless, we need not address the issue further because we conclude that the relief sought here, creation of an enduring obligation to operate a golf course, is not equitable.

¶50 Washington courts operating in equity need not enforce legal rights when doing so would be inequitable. *Proctor*, 169 Wn.2d at 500-01; *Arnold v. Melani*, 75 Wn.2d 143, 152-53, 437 P.2d 908 (1968); *Holmes Harbor Water Co. v. Page*, 8 Wn. App. 600, 605, 508 P.2d 628 (1973). Here, Riverview seeks to have the defendants restore the golf course and its amenities and then permanently operate them. It cites several cases where golf course owners have been directed to maintain community courses. The closest example comes from Oregon. *Mountain High Homeowners Ass'n v. J.L. Ward Co.*, 228 Or. App. 424, 209 P.3d 347 (2009).

¶51 There a housing development was built adjacent to an 18-hole golf course and marketed as a golf course community. *Id.* at 427-28. The golf course was not heavily used and lost money for years. *Id.* at 428-29. Irrigation problems developed, and the golf course suffered, ultimately not operating for two seasons. *Id.* The developer attempted to sell the golf course property, along with adjacent undeveloped land, to another developer and included a restriction that there would be a 9-hole golf course as part of the new development. *Id.* at 429-30. The homeowners group sued to maintain the existing golf course. The trial court found that the golf course was subject to an equitable servitude and enjoined the sale of the course property. The developer was required to maintain the original 9-hole course for a period of 15 years. *Id.* at 430-31. The Oregon Court of Appeals affirmed, ruling that the developer's representations justified the equitable servitude by estoppel. *Id.* at 437-38. The remedy was also affirmed, with the court concluding that it was within the scope of the court's equitable powers and consistent with the intent of the original developer to maintain a golf course in the immediate area. *Id.* at 438-40.

¶52 There are many factual similarities between *Mountain High* and this case. As there, the allegations here are that the developers promoted a "golf course community"

and allegedly told some of the property owners that the course would continue even though there was no written assurance. However, there are also some important differences. Unlike *Mountain High*, Riverview does not represent all of the Deer Meadows community and it is unclear how many of the remaining property owners might have a claim for relief. Also unlike this case, the *Mountain High* developer desired to continue to have a golf course at the community, even if not in the same location. In fashioning its remedy, the court ordered that only part of the original course be maintained and only for a 15-year period. Because of that limited duration, the remedy effectively applied only against the original developer and only for the benefit of the current property owners rather than for and against their successors in interest.

¶53 Here, Riverview is seeking a permanent servitude that would require operation of the golf course and its attendant amenities in perpetuity. The humans who own both the golf course and the homes represented by Riverview will pass away, but the obligation would run forever. It is irrational to require the defendants to rebuild and operate a failing business, particularly when the property owners could have pursued damages awards to compensate them for the diminished property values they may have suffered from the closure of the course.[19] While a limited equitable remedy of some type along the lines of *Mountain High* might have been crafted, we do not believe Riverview's remedy is available on these facts.

¶54 The judgment of the trial court is affirmed.

SWEENEY and KULIK, JJ., concur.

Review granted at 178 Wn.2d 1009 (2013).

---

[19] The decision to pursue equitable relief was understandable given the desire to act in corporate form rather than as a collection of individuals seeking damages.