# FILE

**IN CLERKS OFFICE**
**SUPREME COURT, STATE OF WASHINGTON**

DATE **NOV 2 0 2014**

~~Fairhurst, J.~~
**for CHIEF JUSTICE**

This opinion was filed for record
at **8:00am** on **Nov. 20, 2014**

Ronald R. Carpenter
Supreme Court Clerk



# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| RIVERVIEW COMMUNITY GROUP, a non-profit Washington Corporation, | ) ) ) | |
| Petitioner, | ) ) | No. 88575-3 |
| v. | ) ) ) | |
| SPENCER & LIVINGSTON, a Washington Partnership, and/or its successors-in-interest; GEORGE T. and SHEILA LIVINGSTON, husband and wife, and the marital community composed thereof; DEER MEADOWS, INC., a defunct Washington Corporation, and/or its successors-in-interest; DEER MEADOW DEVELOPMENT, INC., a Washington corporation, and/or its successors-in-interest; S.O.S., LLC, a Washington Limited Liability Company, and/or its successors-in-interest; DEER MEADOWS GOLF, INC., an inactive Washington corporation, and/or its successors-in-interest; also all other persons or parties unknown claiming any right, title, estate, lien, or interest in the real estate described in the complaint herein, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | En Banc

Filed **NOV 2 0 2014** |
| Respondents. | ) ) | |

GONZÁLEZ, J.—We are asked whether property developers' representations about a property anchoring a development may impose an equitable servitude on that property. We find that such representations may impose a servitude if, among other things, they are made by someone with the authority to burden the property. We are also asked whether the Riverview Community Group has the authority to pursue equitable relief based on the developers' representations to its members. We find that it does. We reverse the dismissal of Riverview's lawsuit and remand to the trial court for further proceedings consistent with this opinion.

## FACTS

In the 1980s, Charles Spencer and George Livingston formed a partnership to develop and sell property in rural Lincoln County near the confluence of Lake Roosevelt and the Spokane River. Over the next 20 years, this partnership and its successors built the Deer Meadows Golf Course Complex (including a golf course, restaurant, hotel, store, and club), platted several nearby parcels of property into subdivisions (the Deer Meadows and Deer Heights subdivisions), and sold lots to private land owners for homes and vacation properties. A plat identifying the golf course was recorded, and an image of the plat was used to help advertise the development. A local newspaper quoted Spencer as saying he built the golf course complex "'so it would help sell the residential lots around here,'" and the lots were advertised accordingly. Clerk's Papers (CP) at 107. Over the next 20 years, ownership of the unsold lots and the golf course changed forms and hands several

2

times. After Spencer passed away and after most of the lots were sold, Livingston closed down the golf course complex and began the process of platting the course into new residential lots.

Many of those who had bought homes in the various subdivisions developed by Spencer and Livingston believed they had been promised that the golf course complex would remain a permanent fixture of their community, and they made the decision to purchase homes based in part on that promise. Some of those homeowners formed the Riverview Community Group, which filed this lawsuit seeking to bar the defendants from selling off the former golf course as individual homes, among other things. Riverview argued that the golf course complex was the heart of the community and provided necessary amenities and that its members had bought their property reasonably believing it would remain a part of their development. Riverview named as defendants the original Spencer & Livingston partnership, George and Sheila Livingston, the partnership's alleged successors, and anyone else claiming an interest in the golf course property. Riverview sought to impose an equitable servitude on the golf course property that would limit its use to a golf course or, if that was untenable, for other equitable relief. It also sought injunctive relief.

The Livingstons responded that Riverview's attempt to bring any claims amounted to fraud on the court. They moved for dismissal under CR 12(b)(7) for failure to join indispensable parties under CR 19. S.O.S. LLC, later joined by

Livingston, moved for summary judgment, arguing, among other things, that equitable servitudes were not available in Washington unless created in writing.

In 2012, the trial judge issued a memorandum decision granting the Livingstons' motion under CR 12(b)(7) for failure to join indispensable parties. The decision gave Riverview a "reasonable period of time" to join the Deer Meadows property owners. CP at 212. The following month, the trial court issued an order stating that "the legal issue of whether an equitable servitude can be created by implication is a question of first impression in the State of Washington" and granted summary judgment in favor of the defendants to expedite review. *Id.* at 248.

The Court of Appeals largely reversed the trial court's legal rulings, finding that Riverview had organizational standing and the individual property owners were not essential parties, and concluding that Washington recognized equitable covenants. *Riverview Cmty. Grp. v. Spencer & Livingston*, 173 Wn. App. 568, 295 P.3d 258 (2013). However, it affirmed summary judgment on the grounds that it would be "irrational to require the defendants to rebuild and operate a failing business." *Id.* at 591. We granted Riverview's petition for review. *Riverview Cmty. Grp. v. Spencer & Livingston*, 178 Wn.2d 1009, 308 P.3d 643 (2013). We affirm most of the Court of Appeals' legal rulings but find its dismissal was based on facts not found in the record. We affirm in part, reverse in part, and remand to the trial court for further proceedings.

4

ANALYSIS

We review summary judgment de novo, taking all inferences in favor of the nonmoving party. *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 600, 260 P.3d 857 (2011) (citing *Mulcahy v. Farmers Ins. Co. of Wash.*, 152 Wn.2d 92, 98, 95 P.3d 313 (2004)). We review CR 12(b)(7) dismissals for failure to join an indispensable party under CR 19 for abuse of discretion "with the caveat that any legal conclusions underlying the decision are reviewed de novo." *Gildon v. Simon Prop. Grp., Inc.*, 158 Wn.2d 483, 493, 145 P.3d 1196 (2006) (citing *Equal Emp't Opportunity Comm'n v. Peabody W. Coal Co.*, 400 F.3d 774, 778 (9th Cir. 2005)). Such dismissals "should be employed sparingly when there is no other ability to obtain relief." *Id.* at 494 (citing 7 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1609, at 130 (3d ed. 2001)).

1. MAY RIVERVIEW MAINTAIN THIS ACTION?

Cases should be brought and defended by the parties whose rights and interests are at stake. *See Walker v. Munro*, 124 Wn.2d 402, 419, 879 P.2d 920 (1994) (citing *Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107, 138, 744 P.2d 1032, 750 P.2d 254 (1987)). This principle is reflected in the court rules and in common law limitations on who can bring suit. *Id.*; *see also* CR 17(a). S.O.S. LLC and the Livingstons argue that Riverview lacks standing to sue on behalf of its members, that

it is not a real party in interest, and that the individual landowners are indispensable parties. The Court of Appeals rejected these arguments. We affirm.

"Organizations have standing to assert the interests of their members, so long as members of the organization would otherwise have standing to sue, the purpose of the organization is germane to the issue, and neither the claim nor the relief requires the participation of individual members." *Five Corners Family Farmers v. State*, 173 Wn.2d 296, 304, 268 P.3d 892 (2011) (citing *Int'l Ass'n of Firefighters, Local 1789 v. Spokane Airports*, 146 Wn.2d 207, 213-14, 45 P.3d 186, 50 P.3d 618 (2002) (*Firefighters*)). Riverview has satisfied this test. Several of its members have filed sworn declarations that establish the basis of a claim, satisfying the first element of the *Firefighters* test. The homeowners formed Riverview with the purpose of defending their interests, satisfying the second element. Finally, Riverview can pursue this claim for equitable or injunctive relief without the participation of individual members. The relief requested—the imposition of an equitable servitude on the land and/or some sort of injunctive relief—does not require the participation of the individual members.[1]

---

[1] We respectfully disagree with our dissenting colleagues that the standing inquiry turns on whether Riverview members will be called upon to testify. Dissent at 2 (citing *Firefighters*, 146 Wn.2d at 214; *Ironworkers Dist. Council of Pac. Nw. v. Univ. of Wash. Bd. of Regents*, 93 Wn. App. 735, 741, 970 P.2d 351 (1999)). We have never held that "testimony" is the equivalent of "participation" for the purposes of the third prong of the standing analysis we adopted in *Firefighters*, and the Court of Appeals has explicitly rejected that argument as "without merit." *Teamsters Local Union No. 117 v. Dep't of Corr.*, 145 Wn. App. 507, 512, 187 P.3d 754 (2008); *see also Pugh v. Evergreen Hosp. Med. Ctr.*, 177 Wn. App. 363, 366, 312 P.3d 665 (2013), *review denied*, 180 Wn.2d 1007 (2014). In *Teamsters* the Court of Appeals "refuse[d] to adopt

For similar reasons, we find the CR 17 and CR 19 arguments unavailing. CR 17(a) provides that "[e]very action shall be prosecuted in the name of the real party in interest." Given that we find organizational standing, this rule has been satisfied. Nor have the respondents otherwise established that the individual property owners in the subdivisions were indispensable parties under CR 19(a), and we agree with the Court of Appeals that the trial court was incorrect in concluding otherwise. The Livingstons argue that the individual land owners in the developments are necessary parties because they could individually bring suit, raising the possibility of inconsistent results. Among other things, a party is indispensable when it "is needed for just adjudication." *Gildon*, 158 Wn.2d at 494 (citing *Crosby v. Spokane County*, 137 Wn.2d 296, 306, 971 P.2d 32 (1999)). "[I]f an absent party is needed but it is not possible to join the party, then the court must determine whether in 'equity and good conscience' the action should proceed among the parties before it or should be dismissed." *Id.* at 495 (quoting *Crosby*, 137 Wn.2d at 306-07). Given that Riverview is seeking only equitable and injunctive relief, the other homeowners are not needed

DOC's position that participation of an individual member as a witness abrogates the Union's standing to prosecute the employees wage claims." 145 Wn. App. at 514. Denying organizational standing based on the fact members might be called upon to testify would not further the purpose of the third prong. As the United States Supreme Court explained in a case we discussed at great length in *Firefighters*, this third prong is prudential and exists because without it "the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." *Warth v. Seldin*, 422 U.S. 490, 500, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975). Neither concern is present here, whether or not any of the members testify.

for a just adjunction. If it succeeds, the other property owners will be benefited. *See Auto. United Trades Org. v. State*, 175 Wn.2d 214, 225, 285 P.3d 52 (2012) (noting that an absent party's ability to protect its interest is not impaired if that interest is adequately protected by existing parties). If Riverview's suit ultimately fails, we discern no necessary injury to the property owners who have not joined the cause. While we need not reach the second step, if we do, equity and good conscience do not cry out for dismissal, especially given that the Livingstons have not established that the Court of Appeals was incorrect that the various statutes of limitations on potential claims has or will soon run.

We affirm the Court of Appeals on these intertwined issues and find Riverview may maintain this action.

2. MAY AN EQUITABLE SERVITUDE BE IMPLIED?

Next, we turn to whether, under Washington law, an equitable servitude limiting the use of land may be implied. Riverview argues that it may under either § 2.10 of the *Restatement (Third) of Property* (2000) or *Johnson v. Mt. Baker Presbyterian Church*, 113 Wash. 458, 194 P. 536 (1920). We find that an equitable servitude and injunctive relief are available under *Johnson* and leave for another day whether § 2.10 of the *Restatement* correctly articulates the law in Washington State.

In *Johnson*, a Seattle a property developer platted and developed a new neighborhood, the "Mt. Baker Park, an addition to the city of Seattle." 113 Wash. at 459. The developers advertised the neighborhood as a "strictly high-class residence

section" that "would not permit any buildings other than residences." *Id.* Most of the deeds for lots in the neighborhood included boilerplate language limiting building to "'single, detached residence[s],'" which the court found increased the sale price of the lots by 15 to 20 percent. *Id.* at 460-41. But not all of the deeds in the development contained the boiler plate restriction. *Id.* at 460. A church congregation acquired one of the apparently unrestricted lots, intending to build a church, and the litigation followed. *Id.* at 461. The church acknowledged that it knew the development was intended to be limited to single family homes but argued that the other homeowners could not seek to enjoin it from building a church unless it could "show some right, title, interest or easement in the so-called church lot," which, it contended, would have to have been created in writing on the deed to avoid the statute of frauds. *Id.* at 462.

We disagreed. We declined to apply the statute of frauds because the homeowners' relief did not rest on creation of an interest in the church's land but on "equitable principles." *Id.* at 464. We did not reach the issue of whether the covenant ran with the land to bind successors because the church was fully aware of the restrictions when it bought the property (i.e., all parties had notice of the restrictions). *Id.* at 468-69. Instead, we held that "if this suit had been against the improvement company to enjoin it from making to appellant a deed without restrictions, such suit must have succeeded upon equitable principles . . . . By its conduct and representations, the improvement company imposed on its remaining lots certain use restrictions which it may not now violate." *Id.* at 465-66. Accordingly, "based on

conduct, representations and acts which in justice, between man and man, may not be

repudiated," we affirmed an injunction preventing the congregation from building the

church. *Id.* at 466, 459.

More recently, we observed that words on the face of a plat, such as "golf

course" on one of the recorded plats here, can establish an equitable covenant limiting

the use of land. *Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 691-93, 974 P.2d 836 (1999)

(citing *Thorstad v. Fed. Way Water & Sewer Dist.*, 73 Wn. App. 638, 870 P.2d 1046

(1994)).[2] Even more recently, we have observed that "it is even possible for

covenants to be enforced against those who have no covenant appearing on their title."

*1515-1519 Lakeview Boulevard Condo. Ass'n v. Apt. Sales Corp.*, 146 Wn.2d 194,

204, 43 P.3d 1233 (2002) (citing William B. Stoebuck, *Running Covenants: An

Analytical Primer*, 52 WASH. L. REV. 861, 908-10 (1977)). Taken together, we find

that an equitable servitude may be implied. Under *Johnson*, the statute of frauds is no

---

[2] We find unavailing the respondents' contentions that the parol evidence rule requires the court to turn a blind eye to the plats and other evidence Riverview has presented in support of equitable and injunctive relief. The parol evidence rule limits extrinsic evidence of the parties' contractual intent. *Hollis*, 137 Wn.2d at 693 (citing *Berg v. Hudesman*, 115 Wn.2d 657, 801 P.2d 222 (1990)). This case does not turn on the meaning of the parties' contracts; this case sounds in equity, not contract. Similarly, we are not persuaded that the dead man's statute, RCW 5.60.030, is fatal to this case. Under RCW 5.60.030 testimony of an interested party shall not be admitted "as to any transaction . . . or any statement made" by the deceased. The test of whether an act is a "transaction" within the meaning of the dead man statute "is whether deceased, if living, could contradict the witness of his own knowledge." *In re Estate of Wind*, 27 Wn.2d 421, 426, 178 P.2d 731 (1947). While the dead man's statute may bar some specific testimony from being offered on remand, there is ample evidence presented that does not depend on the testimony of interested parties, such as the recorded plat and various real estate flyers from the realty company describing Deer Meadows as a golf community. CP at 132-44. Without testimony by Riverview members about actions of deceased defendants, the dead man's statute does not apply.

barrier, at least when there is some writing, such as a plat, that supports the imposition of the burden.[3]

Our decision that an equitable servitude may be implied is bolstered by a similar case from Oregon, *Mountain High Homeowners Ass'n v. J.L. Ward Co.*, 228 Or. App. 424, 209 P.3d 347 (2009). Similarly to the case before us, the homeowners in *Mountain High* had bought homes in a development that contained a golf course complex. *Id.* at 427. Also like the case before us, "prospective buyers who asked for assurances that the golf course would remain in place were told that the golf course would continue to be there and that there was no need to worry about it." *Id.* Also like the case before us, the golf course fell on hard financial times and the owner shut down operations. *Id.* at 429. After a full trial, the Oregon trial court imposed an equitable servitude on the golf course property limiting its use to a golf course and entered an injunction requiring the developer "to reconstruct, maintain, and operate the nine-hole golf course for 15 years." *Id.* at 431. The Court of Appeals affirmed.

---

[3] We respectfully disagree with the concurrence/dissent that summary judgment should be affirmed on this record. See concurrence/dissent at 1-2, 9-10. Taken in context, the trial judge's oral observation at summary judgment that there was "nothing in writing" appears to us to mean there was no written instrument *creating* an encumbrance, not that there was no writing *evidencing* the creation of an equitable servitude. Verbatim Tr. of Proceedings (Dec. 23, 2011) at 21. Whether encumbrance had to be created in writing was a major issue in the summary judgment hearing, enough so that plaintiff's counsel proposed entering a RAP 2.3(b)(4) order allowing immediate review. *Id.* at 14. While the respondents' counsel declined to join the motion, the trial court's order clearly echoes the language of RAP 2.3(b)(4), strongly suggesting that the judge was motivated at least in part to obtain an appellate ruling on whether equitable servitudes could be implied. CP at 248. Also, there are other writings in this record, and there may be more found after further discovery, that provide at least some evidence that those with the power to encumber the property did so, as well as other evidence suggesting an encumbrance. *E.g., Id.* at 97, 99, 100-02, 107, 151.

*Id.* at 438. It reasoned that the imposition of an equitable servitude and an enforcing injunction was justified because

> [d]efendant represented to buyers that Mountain High was and would continue to be a golf course community. That representation was made both expressly and impliedly. It was reasonably foreseeable that, in deciding whether to purchase land within Mountain High, a prospective buyer would rely on those representations and substantially change position as a result of that reliance. The owners did, in fact, purchase property in Mountain High, substantially changing their positions as a result of defendant's representations. It was reasonable for buyers to rely on the representations of the developer of Mountain High and the owner of the Mountain High golf course in making their decisions to purchase in the community. Under all the circumstances, including the condition of the golf course property as of the date of trial in this case, it would be unjust for defendant to benefit from the successful marketing of Mountain High as a "golf course community" without the imposition of the servitude. Accordingly, we conclude that the trial court did not err in declaring the existence of the equitable servitude.

*Id.* at 438-39. We agree.[4]

We find that Riverview has presented sufficient evidence to survive summary judgment under *Johnson*. The evidence presented creates a material question of fact of whether those with the power to burden the property induced purchasers to purchase lots on the promise that the golf course would remain a permanent fixture of the community. Under *Johnson*, both equitable and injunctive relief may be available. 113 Wash. at 464-65.

We acknowledge that there is force to the Court of Appeals' conclusion that requiring the respondents to operate an unprofitable golf course would be inequitable.

---

[4] We recognize that the Oregon court has explicitly adopted the *Restatement* approach. We nonetheless find the case helpful.

*See Riverview Cmty. Grp.*, 173 Wn. App. at 590 (citing *Proctor v. Huntington*, 169 Wn.2d 491, 500-01, 238 P.3d 1117 (2010)). But we find nothing in this record that provides an adequate factual basis for the Court of Appeals' disposition on this basis. Further, while Riverview's complaint primarily seeks "[a] decree quieting title to an equitable servitude in defendants' real property . . . that Deer Meadows and Deer Heights may continue as a . . . golf course community [with] an operating 18-hole golf course" and a consistent injunction, it did not limit its prayer for relief to those remedies. CP at 20-23. Only if on remand Riverview establishes that someone with the power to encumber the golf course property did so will the question of an equitable remedy arise. At that point, the parties will be free to present evidence and argument as to the nature and scope of any appropriate equitable and injunctive relief. *See, e.g., Mountain High*, 228 Or. App. at 440 (imposing a servitude limiting the use of the property in perpetuity but only imposing the injunction for a limited period of time).

CONCLUSION

We affirm the Court of Appeals to the extent that it found Riverview had standing to maintain the suit, that dismissal under CR 17 and CR 19 was unwarranted, and that an equitable servitude may be created by implication. We reverse the Court of Appeals' dismissal and remand to the trial court for further proceedings consistent with this opinion.

González, J.

WE CONCUR:

Stephens, J.

Wiggins, J.

Owens, J.

J.M. Johnson, J.P.T.

No. 88575-3

GORDON McCLOUD, J. (concurring in part and dissenting in part)—I
agree with the majority that Riverview Community Group has standing to bring
this lawsuit on behalf of its members and that individual landowners in the
developments are not indispensable parties. Majority at 5-7. But I also believe
that it is necessary to reach the issue that the majority "leave[s] for another day,"
that is, whether *Johnson v. Mt. Baker Park Presbyterian Church*, 113 Wash. 458,
194 P. 536 (1920), or § 2.10 of the *Restatement (Third) of Property: Servitudes
(2000)* provides controlling law on the existence of implied equitable servitudes in
Washington. I conclude that *Johnson* is controlling precedent and that as the
majority states, it held that Washington recognizes equitable servitudes by
implication. *Johnson*, 113 Wash. at 466.

However, I disagree with the majority's holding that Riverview presents
evidence sufficient to survive summary judgment under *Johnson*. *Johnson* and
subsequent Washington decisions found implied equitable servitudes only where

the landowners presented more evidence than Riverview presents here. I therefore respectfully dissent from the majority's holding on that point; I would affirm the Court of Appeals' dismissal of this case.

I. RIVERVIEW MEETS THE REQUIREMENTS FOR ORGANIZATIONAL STANDING

To establish standing, Riverview must show that "(1) [its] members . . . would otherwise have standing to sue in their own right; (2) the interests [it] seeks to protect are germane to its purpose; and (3) neither [the] claim asserted nor [the] relief requested requires the participation of its individual members." *Int'l Ass'n of Firefighters, Local 1789 v. Spokane Airports*, 146 Wn.2d 207, 213-14, 45 P.3d 186, 50 P.3d 618 (2002) (*Firefighters*) (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977)).

"Unlike the third prong of the test, the first two prongs are constitutional in that they ensure that article III, section 2's 'case or controversy' requirements are satisfied." *Id.* at 215 (citing *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 116 S. Ct. 1529, 134 L. Ed. 2d 758 (1996); U.S. CONST. art. III, § 2). For the judicially created third element, the ultimate test is "'whether the circumstances of the case and the relief requested make individual participation of the association's members indispensable.'" *Id.* (quoting *Firefighters*, 103 Wn. App. at 770). An association generally has standing to sue

"as long as one of its members has standing." *E. Gig Harbor Improvement Ass'n v. Pierce County,* 106 Wn.2d 707, 710, 724 P.2d 1009 (1986). These requirements "permit a single plaintiff to adequately represent the interests of its many members in a single lawsuit, thus avoiding repetitive and costly independent actions." *Teamsters Local Union No. 117 v. Dep't of Corr.,* 145 Wn. App. 507, 512, 187 P.3d 754 (2008).

The dissent "would hold that Riverview fails the third element," i.e., that individual member participation is not required for relief. Dissent at 2. It even questions whether Riverview fails the second element—seeking to vindicate interests germane to its purpose—because Riverview's "entire purpose is to bring a lawsuit." *Id.* at 2 n.1.

The dissent errs on both points. As to the second element—that the association seek relief that is germane to its purpose—the dissent cites no authority barring "an organization whose entire purpose is to bring a lawsuit" from bringing a lawsuit on behalf of its members. Indeed, there is none. In *Save a Valuable Environment v. City of Bothell,* 89 Wn.2d 862, 865, 576 P.2d 401 (1978) (*SAVE*), after the city of Bothell rezoned a parcel of farm land to allow construction of a major regional shopping center, a group of individuals formed a nonprofit corporation "for the declared purpose of working to maintain the quality of the

living environment in the area of the Northshore School District in King and Snohomish counties," an area that included Bothell. SAVE claimed that the rezone would detrimentally affect both the environment and the economy of the area. *Id.* In holding that SAVE had standing to sue, we explained,

> An individual who is one of many harmed by an action may be unable to afford the costs of challenging the action himself. A class suit may be too cumbersome. An association or nonprofit corporation of persons with a common interest can then be the simplest vehicle for undertaking the task, and we see no reason to bar injured persons from this method of seeking a remedy. It is argued that a nonprofit corporation without assets may be unable to pay costs assessed against it should it fail in its suit. The same can be said of any individual person, however. It is not appropriate to bar an injured party from a judicial remedy simply because that party does not have assets.

*Id.* at 867-68. Riverview asserts, "After closing down and wasting the golf course complex, the aggrieved landowners in this case banded together and formed a non-profit association to seek relief." Appellant's Opening Br. at 10; Clerk's Papers (CP) at 206. Based upon our reasoning in *SAVE*, Riverview meets the second element.

Riverview also meets the third prerequisite to organizational standing—that neither the claim asserted nor the relief requested requires participation of the individual members. This third prerequisite generally bars an association from seeking damages on behalf of members when each member would have to

establish individual damages. *Firefighters*, 146 Wn.2d at 214-15. If the individual members must participate, no need exists for the association to do so.

In this case, however, the parties request equitable relief, not damages. The difference is critical. In *Firefighters*, we held that a fire fighters' union had associational standing to sue an employer for wrongful conversion. *Id.* at 217. The union sought money damages, although it did not allege an injury to itself or receive an assignment of its members' damage claim. *Id.* at 216. We concluded that the monetary damages to each of the union members was "certain, easily ascertainable, and within the knowledge of the defendant." *Id.* at 215-16. We explained,

> If we reached the result advanced by [petitioner] we would likely burden individual members of the employee association economically and would almost certainly burden our courts with an increased number of lawsuits arising out of identical facts. In short, we see little sense in an ironclad rule that has the effect of denying relief to members of an association based upon an overly technical application of the standing rules.

*Id.* at 216.

Similarly, in *Hunt*, upon which our court relied in *Firefighters*, the United States Supreme Court explained,

> "[W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of

prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind."

*Hunt*, 432 U.S. at 343 (quoting *Warth v. Seldin*, 422 U.S. 490, 515, 95 S. Ct. 2197, 2213, 45 L. Ed. 2d 343 (1975)).

In fact, I find no cases denying standing when the organization seeks only equitable relief and satisfies the first two elements of the test for standing. *See Columbia Basin Apt. Ass'n v. City of Pasco*, 268 F.3d 791, 799 (9th Cir. 2001) ("Appellants request only injunctive and declaratory relief. Because these forms of relief do not require individualized proof, the third prong of the *Hunt* test is satisfied."); *Alaska Fish & Wildlife Fed'n & Outdoor Council, Inc. v. Dunkle*, 829 F.2d 933, 938 (9th Cir. 1987) ("[B]ecause the [organization] seeks declaratory and prospective relief rather than money damages, its members need not participate directly in the litigation.").

I therefore agree with the majority's decision that Riverview has standing.

II. *JOHNSON*, NOT THE *RESTATEMENT*, PROVIDES CONTROLLING LAW ON THE EXISTENCE OF IMPLIED EQUITABLE SERVITUDES IN WASHINGTON

I disagree with the majority's analysis of whether Riverview has offered sufficient evidence to survive summary judgment, though.

*Johnson* held, as the majority states, that based upon the existence of a common plan or development scheme, a court may impose the benefit and burden of restrictions that a common grantor or developer imposed, and under this equitable theory, a property owner in a development may be able to enforce a restriction against another property owner who is not expressly subject to the restriction. *Johnson*, 113 Wash. at 464-65. The Court of Appeals concluded correctly, "Although old, *Johnson*'s holding has never been questioned." *Riverview Cmty. Grp. v. Spencer & Livingston*, 173 Wn. App. 568, 589, 295 P.3d 258 (2013).

On the other hand, the *Restatement* would establish equitable servitudes in a wider range of cases. The *Restatement* states,

> If injustice can be avoided only by establishment of a servitude, the owner or occupier of land is estopped to deny the existence of a servitude burdening the land when:

> > (1) the owner or occupier permitted another to use that land under circumstances in which it was reasonable to foresee that the user would substantially change position believing that the permission would not be revoked, and the user did substantially change position in reasonable reliance on that belief; or

> > (2) the owner or occupier represented that the land was burdened by a servitude under circumstances in which it was reasonable to foresee that the person to whom the representation was made would substantially change position on the basis of that representation, and the person did

7

substantially change position in reasonable reliance on that representation.

RESTATEMENT § 2.10.

To establish an equitable servitude by estoppel, the *Restatement* requires a property owner to show (1) an express or implied representation made under circumstances where (2) it is reasonably foreseeable that the person to whom the representation is made will rely on it, (3) that the person relies on the representation, (4) that such reliance is reasonable, and (5) that establishing a servitude is necessary to avoid injustice. *Mountain High Homeowners Ass'n v. J.L. Ward Co.*, 228 Or. App. 424, 438, 209 P.3d 347 (2009).

The *Restatement* also contains the following illustration, which uses a fact pattern similar to the facts here as an example of an equitable servitude:

> P bought a lot abutting a golf course in a residential subdivision. The developer, who owned the golf course, represented that the golf course would be subject to restrictions that would ensure its maintenance as a golf course for 50 years. Sales brochures for the subdivision showed pictures of the golf course and stated that all residents would have access to golf-club memberships. The developer now plans to discontinue the golf course and build apartment houses on the golf course. Giving effect to the oral representation would be justified. Given the existence of the golf course, the specificity of the representations, the brochures, and the likely expectation of residential purchasers that their deeds would not reflect the developer's obligations with respect to the golf course, their reliance was reasonable.

RESTATEMENT § 2.9 illus. 10.

8

Under the *Restatement* test, as the majority implies, Riverview's case would survive summary judgment. But under the *Johnson* test, as I explain below, Riverview's case would not survive summary judgment. Thus, we must address which test applies in Washington.

As the Court of Appeals explained, *Johnson* is a case from our court that has not been overruled or limited. We will not overrule it unless we are convinced that it is both incorrect and harmful. *State v. Njonge*, __ Wn.2d __, 334 P.3d 1068, 1074 (2014) (citing *In re Rights to Waters of Stranger Creek*, 77 Wn.2d 649, 653, 466 P.2d 508 (1970)). None of the parties really argue that, and my own research doesn't convince me of that. Thus, under controlling precedent, we have no reason at this point to abandon *Johnson*. I therefore apply the *Johnson* test to this case in the section below and explain more fully why Riverview might be able to overcome summary judgment under the *Restatement*, but not under *Johnson*.

III.    RIVERVIEW PRESENTS NO QUESTION OF MATERIAL FACT ABOUT
        WHETHER WE CAN IMPOSE THE BENEFIT AND BURDEN OF
        RESTRICTIONS THAT A COMMON GRANTOR OR DEVELOPER IMPOSED

In opposition to the respondents' Civil Rule 12(b)(7) and summary judgment motions, Riverview presented evidence to the trial court to support its implied equitable servitude claims. At the hearing on summary judgment, the court stated, "[I]n this case it's undisputed that there is nothing in writing with respect to the

golf course." Verbatim Tr. of Proceedings (Dec. 23, 2011) at 21.[1] The evidence

showed that out of four recorded Deer Meadows plats and the three Deer Heights

plats, only one, Deer Meadow Plat 3, noted the presence of a golf course. CP at

29-35, 38, 39, 110.[2] Deer Meadow Plat 3 contains sections titled "Easement

Provisions" and "Restrictions and Reservations." *Id.* at 39. The easement

provisions address public utilities and contain no reference to the golf course. The

restrictions section also contains no reference to the golf course; the restrictions

relate only to road maintenance. *Id.* at 34. And none of the real estate contracts

provided contain any reference to the golf course, although they note applicable

covenants, conditions, and restrictions. *Id.* at 90-95, 106, 116-26, 135, 186.[3]

---

[1] In rejecting Riverview's request to adopt the *Restatement*, the Court of Appeals did not address whether a writing existed here. *Riverview Cmty. Grp.*, 173 Wn. App. at 585, 589.

[2] This includes both the original and the replat of Deer Meadow Plat 1. CP at 31.

[3] Notably, real estate contracts for lots in Deer Meadow Tract Plats 2 and 3 contain merger clauses stating,

> 33. <u>Merger Clause</u>. This Real Estate Contract expresses the full and final purpose and agreement of the parties regarding sale of the property and will not be qualified, modified, or supplemented by course of dealing, usage of trade, or course of performance. There are no verbal agreements which qualify, modify, or supplement this Real Estate Contract.

Riverview also submitted a number of declarations citing oral assurances about the golf course. Riverview member Howard Walker stated that when he purchased his lot, "I was under the distinct impression that we were purchasing a lot in an 18 hole golf course community. That impression was based on the fact that Sherie Wardian marketed the lot as such to us." *Id.* at 129. Walker also stated, "Sherie gave me real estate flyers that represented the community as having an 18 hole golf course as the center attraction." *Id.*

Riverview member Ken Sweeny's declaration stated that he and his wife received a membership to the golf course "as an inducement to purchase a lot." *Id.* at 102. Sweeny stated that he read an article in the Spokesman Review newspaper in 1999 in which Charles Spencer said that he "'just started the course so it would help the residential lots around here'" and that George Livingston built the golf course "in hopes of luring more permanent residents to the area." *Id.* at 102, 107. Sweeny also submitted a declaration stating that when he went with his wife to speak with Bonnie Spencer about purchasing a lot in the developments, "[w]e were introduced to Gloria [Spencer] and asked her 'Is there a chance that the golf course

---

*Id.* at 95, 124. And contracts for lots in Deer Meadow Tract Plat 1 and Deer Heights Plat 1 state, "13. There are no verbal or other agreements which modify or affect this agreement unless attached hereto." *Id.* at 106, 135. I agree with the majority, however, that because this is a case about equity, not contract interpretation, the parol evidence rule is not at issue here. Majority at 10 n.2.

11

would be broken up and sold for lots in the future'? Gloria replied, '<u>NO</u>, it would remain an 18 hole golf course.'" CP at 101. Sweeny said that he told Gloria Spencer, "[T]hat was the main reason my wife and I were interested in buying a lot because it was in an 18 hole golf course community." *Id.*

Riverview member Mark Jensen stated in a declaration,

> Mr. Livingston represented to us at all times that the Deer Meadows Golf Course was an integral part of the Deer Meadow's community, which he had advertised as being "more than just a sub-division" but a "residential community" which included the golf course and its facilities, the restaurant, lounge, bar, pro shop and motel. Mr. Livingston and his agents represented this was "golf course living at its finest." I saw these marketing materials and advertisements. I spoke with Mr. Livingston['s] agents about it.

*Id.* at 86.

Riverview also submitted real estate flyers and a Lake Roosevelt Recreation Guide for summer 1997 containing references to the golf course. *Id.* at 97-99, 138, 140, 142-44.

This evidence is insufficient to create a material question of fact about whether to impose an equitable servitude. In *Johnson*, all but 4 or 5 of the 650 lots sold in the development contained the residential restriction at issue. *Johnson*, 113 Wash. at 460. This court stated in *Johnson*,

> Here the appellant bought its property with knowledge of all the facts; it knew that the improvement company from the beginning had established and advertised a general plan whereby all of the property

in this subdivision should be used for residence purposes only; it knew that the improvement company had agreed with a great many purchasers of lots, that the platted addition would be used only for restricted purposes; it knew that the deeds to nearly all lots which had been sold contained clauses restricting the use of the lots sold. In fact, by the contract which it entered into with the improvement company when it bought its lot, it agreed to protect the improvement company against any damage or expense resultant from deeding to it without restrictions, and therein it expressly agreed that, if it sold its lot before constructing the church, it would insert in its deed the restrictive clause.

*Id.* at 465.

In this case, in contrast, no deed or registered plat contained a restriction about the golf course. And the marketing materials suggested no building restrictions on the respondents or on the property purchasers. The only purported writing suggesting a restriction is the single plat noting a golf course. But the fact that this plat contains express restrictions that do not reference the golf course indicates that the grantor or developer declined to impose a restriction related to the golf course. Although the record shows that the golf course existed and that it might have enticed purchasers to buy the lots, no writing indicates an assurance that the golf course would continue to operate in perpetuity. And no evidence shows an intent to bind future property owners to the alleged restriction. Riverview's evidence is thus insufficient to indicate a common plan or scheme

under *Johnson*. *Johnson* did not permit oral assurances or advertising to suffice where no writing showed a common plan or scheme.

The majority cites *Hollis* for the proposition, "[W]e observed that the words on the face of a plat, such as 'golf course' on one of the recorded plats here, can establish an equitable covenant limiting the use of land." Majority at 9-10; *Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 974 P.2d 836 (1999). In *Hollis*, the court stated that "the restriction may also be contained on the face of the subdivision plat." *Hollis*, 137 Wn.2d at 691. The plat in *Hollis* contained an "owner's certificate" that 10 individuals signed and also contained a section labeled "Restrictions" that defined three restrictions on the use of the land. *Id.* at 686. The purchaser's deed to the property stated that it was subject to easements in the plat. All purchases took place after the filing of the plat. *Id.* at 686-88.

But here, Deer Meadows Plat 3, filed after at least one of the purchasers purchased his lot, contains only the label "golf course." This was the only plat that referenced a golf course. Neither the plats nor any of the deeds contained explicit restrictions referencing the golf course, although they contained other restrictions, conditions, and covenants.

Finally, the majority cites *Mountain High*, a case from the Oregon Court of Appeals. The majority states that this case supports its argument, citing the Oregon court's reasoning:

> Defendant represented to buyers that Mountain High was and would continue to be a golf course community. . . . It was reasonable for buyers to rely on the representations of the developer of Mountain High and the owner of the Mountain High golf course in making their decisions to purchase in the community. Under all the circumstances, including the condition of the golf course property as of the date of trial in this case, it would be unjust for defendant to benefit from the successful marketing of Mountain High as a "golf course community" without the imposition of the servitude.

*Mountain High*, 228 Or. App. at 438; majority at 11. The two cases do share factual similarities, including oral assurances that the golf course would remain and marketing material presenting the development as a "'golf course community,'" although the entrance to the community in *Mountain High* had a sign that read "'Mountain High Golf Villages.'" 228 Or. App. at 427. But, as the majority acknowledges, *Mountain High* relied on the *Restatement*, which, as discussed above, is not Washington law. Therefore, *Mountain High* is not applicable here.

Under *Johnson*, the crucial fact in this case is that the only writing supporting Riverview's argument is one plat out of four registered plats containing an area marked "golf course." Although Riverview's evidence of oral and written

15

representations might suffice under the *Restatement* approach, Riverview raises no genuine issue of material fact that any restriction existed under Washington law.

IV.    CONCLUSION

Because Riverview satisfies all of the elements for organizational standing established in *Firefighters*, I agree with the majority's decision that Riverview can bring this action on behalf of its members and that the individual property owners are not essential parties. But Riverview's evidence in opposition to summary judgment fails to raise a genuine issue of material fact about whether the respondents created a common plan or development scheme under *Johnson*. I would affirm the Court of Appeals' dismissal on alternate grounds. I therefore respectfully dissent in part.

_Geds McCld, J._

No. 88575-3

FAIRHURST, J. (dissenting)—Riverview Community Group is a nonprofit

organization that was formed for the sole purpose of suing on its members' behalf

to continue the operation of the golf course or at least prevent that land from being

subdivided into more homes. Riverview is the only plaintiff. None of the individual

property owners are joined in this suit. Riverview was formed on or about September

20, 2010, meaning it was not in existence at any time during the events underlying

this cause of action. No promises were made to Riverview. No marketing was done

to it. Riverview is an entirely new entity apparently formed so the property owners

can avoid suing individually or complying with the requirements for class action

suits. I would find that Riverview does not have standing to bring suit in this case

and respectfully dissent.

The majority correctly quotes the rule for organizational standing from

*International Ass'n of Firefighters, Local 1789 v. Spokane Airports,* 146 Wn.2d 207,

213-14, 45 P.3d 186, 50 P.3d 618 (2002):

> An association has standing to bring suit on behalf of its
> members when the following criteria are satisfied: (1) the members of

the organization would otherwise have standing to sue in their own right; (2) the interests that the organization seeks to protect are germane to its purpose; and (3) neither claim asserted nor relief requested requires the participation of the organization's individual members.

However, unlike the majority, I would hold Riverview fails the third element.[1]

Case law discussing this third element of the test for organizational standing focuses on whether the remedy sought required the testimony of the individuals. Both *Ironworkers District Council of the Pacific Northwest v. University of Washington*, 93 Wn. App. 735, 741, 970 P.2d 351 (1999), and *Firefighters*, 146 Wn.2d at 214, assert that if an organization seeks an injunction, that injunctive relief generally benefits every member of an association and individual testimony as to how the injunction will benefit each member is not necessary. *See also Warth v. Seldin*, 422 U.S. 490, 515, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975). Similarly, the majority focuses on only whether the remedy sought needs individual participation. Majority at 6 ("The relief requested—the imposition of an equitable servitude on the land and/or some sort of injunctive relief—does not require the participation of the individual members."). We recognize that Riverview is seeking an injunction, and

---

[1] We also question whether an organization whose entire purpose is to bring a lawsuit satisfies the second element of this test. Suing is not germane to the purposes of Riverview. It is the entire reason for its formation and existence. It is all the entity was formed to do. However, courts have generally interpreted this element of organizational standing liberally and since we find that Riverview fails to meet the third part of the test, we need not discuss this further.

under our precedent plaintiffs do not need to testify individually to prove this remedy will benefit them.

But the third element requires that *neither* the claim asserted *nor* the relief requested requires individual participation. Here, the claim for an implied equitable servitude requires the individual participation of the property owners. An equitable servitude is a restriction on property that runs with the land. This servitude was not written or explicit. Riverview claims the court should find the servitude is implied based on representations the defendants made to the property owners that the land would be restricted to certain use. As a nonprofit, Riverview is a separate entity from its members and does not itself have any rights or interest in the servitude created. *See Apostolic Faith Mission of Portland v. Christian Evangelical Church,* 55 Wn.2d 364, 367, 347 P.2d 1059 (1960). Since it did not exist at the relevant time, no representations were made to it that could support this claim for an implied equitable servitude.

Riverview is made up of at least five property owners in the development, but we have no information about the existence or the interests of any other members of Riverview. These property owners bought their properties from different entities: George Livingston, Charlie and Gloria Spencer through S.O.S. LLC, the Spencer & Livingston partnership, or TURF Realty. There is no consistency regarding who made these promises from which this court should imply the equitable servitude.

And if after remand the court finds that this golf course must continue to be operated, it is unclear against whom a remedy would be imposed. Since the particular representations made to the property owner make up the entire claim for an implied equitable servitude, the testimony of the individual property owners is necessary.[2]

To satisfy the third element for organizational standing, the ultimate question is "'whether the circumstances of the case and the relief requested make individual participation of the association's members indispensable.'" *Firefighters*, 146 Wn.2d at 215 (quoting *Int'l Ass'n of Firefighters, Local 1789 v. Spokane Airports*, 103 Wn. App. 764, 770, 14 P.3d 193 (2000) (citing *Warth*, 422 U.S. at 511)). Here, the testimony of the individual property owners is imperative and the members' participation indispensable because of the nature of the claim. I would hold Riverview does not have standing to bring suit.

---

[2]The plaintiff and the majority cite cases from other jurisdictions in which implied equitable servitude has been recognized, but these cases involve distinguishable plaintiffs. In *Mountain High Homeowners Ass'n v. J.L. Ward Co.*, 228 Or. App. 424, 426, 209 P. 3d 347 (2009), the suit was brought by the homeowners association that had been in existence since the outset of the development whose members had been members at all times when the relevant facts unfolded. Further, Oregon had a specific statute that allowed the homeowners association to bring the suit in its own name. *Id.* at 437. Riverview is not a homeowners association and does not claim to be. Thus, *Mountain High Homeowners Ass'n* does not support finding standing for a nonprofit entity created after all relevant events to sue to imply an equitable servitude. Additionally, Riverview refers the court to both *Shalimar Ass'n v. D.O.C. Enterprises, Ltd.*, 688 P.2d 682 (Ariz. Ct. App. 1984), and *Ute Park Summer Homes Ass'n v. Maxwell Land Grant Co.*, 1967-NMSC-086, 77 N.M. 730, 427 P.2d 249, to support its claim. But standing is never raised as an issue in either case, so the decisions are unhelpful for the standing issue.

The potential implications from the majority opinion are disconcerting. Here, we essentially have a plaintiff who is acting as if it is the named class plaintiff for an unnamed group of representative plaintiffs without complying with CR 23. By not clearly admonishing this circumvention of basic court rules and forcing the plaintiffs to bring this meritorious suit in the proper way, the majority opens the door for groups of individuals with similar claims against a group of people to simply form a nonprofit to sue on their behalf, thereby avoiding the stringent class action requirements or the spotlight of individual litigation. Under the facts of this case, the property owners may bring either a class action lawsuit or they may join together as individuals like the plaintiffs in *Johnson v. Mt. Baker Park Presbyterian Church,* 113 Wash. 458, 194 P. 536 (1920), and *Hollis v. Garwall, Inc.,* 137 Wn.2d 683, 974 P.2d 836 (1999), but they may not create a nonprofit entity after all events at issue have occurred for the sole purpose of suing.

## CONCLUSION

I would find that Riverview does not have standing to bring suit and dismiss the case. Since I would find that Riverview is not a proper plaintiff, I do not reach the question of whether implied equitable servitudes are available in Washington.

Fairhurst, J.

Madsen, C.J.