IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| TEN BRIDGES, LLC, | ) | No. 80084-1-I |
| Appellant/Cross Respondent, | ) | |
| v. | ) | |
| TERESIA GUANDAI, | ) | |
| Respondent/Cross Appellant, | ) | |
| MIDAS MULLIGAN, LLC, | ) | |
| Respondent. | ) | |
| TEN BRIDGES LLC; CARLYLE CONDOMINIUM OWNERS ASSOCIATION, | ) | No. 80456-1-I |
| Appellants, | ) | |
| v. | ) | |
| YUKIKO ASANO, | ) | PUBLISHED OPINION |
| Respondent. | ) | |

VERELLEN, J. — To protect consumers, RCW 63.29.350 caps the fees a fund-finder can claim as compensation for locating surplus proceeds deposited with a superior court clerk following foreclosure of a lien on a property. Ten Bridges, LLC argues the quitclaim deeds it convinced Yukiko Asano and Teresia

Guandai to sign were ordinary real estate transactions and not an equity-stripping scheme violating the statutory cap on excessive fees. But the form of a transaction cannot be used to evade a statute. Because the substance of the quitclaim deeds reveals Ten Bridges sought more than five percent of the surplus proceeds for itself as compensation for having located the surplus proceeds for their rightful owners, the quitclaim deeds violated RCW 63.29.350 and were void.

Regarding Guandai's cross appeal, the court did not abuse its discretion by returning the parties to their respective positions prior to signing the void quitclaim deed.

Therefore, we affirm.

FACTS

Appellant Ten Bridges describes itself as a national business that works to locate surplus proceeds from foreclosure sales and to identify the individuals who have a right to assert a claim to them but have not done so due to a lack of awareness, desire, or ability to pursue the funds for themselves. Ten Bridges culls thousands of foreclosure and public auction records to locate the proceeds and the person with a right to claim them before acquiring the right to claim the funds. Amici, including the Northwest Justice Project and Northwest Consumer Law Center, assert Ten Bridges is running a predatory equity-stripping scheme that causes both immediate and lasting harms to its customers because "post-foreclosure equity-stripping schemes prevent homeowners from stabilizing their lives following foreclosure, rebuilding wealth, and transmitting wealth to their

children and grandchildren."[1]  As part of the foreclosure of liens against their condominiums, the King County Sheriff sold Yukiko Asano and Teresia Guandai's condominiums at auction to Madrona Lisa, LLC and Midas Mulligan, LLC, respectively.  Asano and Guandai then sold Ten Bridges their rights to claim surplus proceeds.  Both sales to Ten Bridges were voided for violating RCW 63.29.350.

Yukiko Asano

In March 2019, Asano's condominium was sold at public auction to Madrona Lisa after the court foreclosed on a lien held by Asano's condominium owners association for just over $14,000 of unpaid assessments.  The sheriff returned $346,902.95 in surplus proceeds to the King County Superior Court clerk's office after paying off the lien and other expenses.  A few weeks later, Matt Cox of Ten Bridges e-mailed Asano, a resident of Tokyo, to convince her to quitclaim her remaining interest in the condominium, including the right to the surplus funds and the right to redeem, in exchange for $172,000 it would obtain from the surplus funds and transfer to her.  Asano was surprised because she had not known about the foreclosure, sale, or surplus funds.  Asano signed a quitclaim deed in May.

In July, Ten Bridges tendered a check for $375,556.41 to the sheriff to redeem the condominium, despite knowing the declared redemption price was

---

[1] Nw. Just. Project Amicus Br. at 13.  The Office of the Attorney General also filed an amicus brief in support of respondents.

$413,361.61. The sheriff refused the tender. Ten Bridges filed a motion to set the redemption price at $375,556.41 and relied upon the quitclaim deed as proof of its right to redeem. Madrona Lisa opposed the motion, arguing Ten Bridges had no right to redeem the property because the quitclaim deed violated RCW 63.29.350. On August 8, the court concluded Ten Bridges had no right to redeem the property because the quitclaim deed was void for violating RCW 63.29.350.

On August 10, Cox asked Asano to sign a second quitclaim deed, explaining "the additional form I sent you may save us time" and would have "no effect whatsoever on our existing agreement."[2] Cox did not tell her the court had voided the first quitclaim deed. Asano signed the second deed. After learning the first quitclaim deed had been declared illegal and void, she hired Madrona Lisa's attorney to represent her in opposing Ten Bridges' efforts.

In October, Ten Bridges filed another motion to set the redemption price of the property, this time at $375,506.03, and relied upon the second quitclaim deed as proof of its right to redeem. Madrona Lisa opposed the motion, noted the redemption price had increased to $430,937.91 due to accruing interest, and argued the second quitclaim deed was also void for violating RCW 63.29.350. The court concluded that Ten Bridges had no right to redeem the property because the second quitclaim deed was also void for violating RCW 63.29.350.

Ten Bridges appeals both orders voiding the quitclaim deeds.

---

[2] Clerk's Papers (CP) at 505 (No. 80456-1-I).

4

Teresia Guandai

Guandai's condominium was sold to Midas Mulligan for $116,000 at public auction. Guandai's condominium owners association had filed for and successfully foreclosed on a lien for unpaid assessments. By the time of the sale, Guandai owed almost $27,000. After paying off the lien and other expenses, the sheriff deposited just under $90,000 in surplus proceeds with the King County Superior Court clerk's office.

Guandai had one year to redeem. Matt Cox of Ten Bridges soon called Guandai and told her she "might" be able to receive the surplus funds, but it would be "nearly impossible."[3] Guandai had not known about the funds before his call. Cox called repeatedly, offering $15,000 for her remaining interest in her home and her right to claim the surplus proceeds. When the year was almost over, Guandai faced losing her home and needed money. She spoke with Cox again and agreed to sell. Guandai signed a quitclaim deed transferring her interest in the condo, including any right to surplus proceeds from its sale, to Ten Bridges. Ten Bridges wired her $15,000.

A few weeks later, Ten Bridges filed a motion to have the surplus funds disbursed to it. It sent notice of its motion to Midas Mulligan and to Guandai at her now-vacant condominium. Guandai did not appear at the May 15, 2019 hearing. Midas Mulligan opposed the motion and argued either Guandai was entitled to the money or, if she did not assert a claim, then it was entitled to the

---

[3] CP at 271-72 (No. 80084-1-I).

5

surplus funds as the property owner. It requested an evidentiary hearing to determine whether Ten Bridges' agreement with Guandai violated RCW 63.29.350.

At the next hearing, Guandai appeared pro se with Midas Mulligan and Ten Bridges. The court concluded RCW 63.29.350 applied, voided Ten Bridges' agreement with Guandai, and awarded her the surplus proceeds, except for the $15,000 Ten Bridges already paid her.

Ten Bridges appeals, and Guandai cross appeals the ruling disbursing $15,000 of the surplus proceeds to Ten Bridges.

ANALYSIS

I. Standing

As a threshold matter, we address Ten Bridges' challenge to Madrona Lisa's standing to oppose its attempts to set the price of and redeem the condominium Asano used to own.

"We review de novo whether a party has standing."[4] A party "whose rights and interests are at stake" has standing to defend against an action.[5] A party has standing when it can demonstrate, first, an injury "fairly traceable to the challenged conduct and likely to be redressed by the requested relief," and,

---

[4] Bavand v. OneWest Bank, 196 Wn. App. 813, 834, 385 P.3d 233 (2016) (citing In re Estate of Becker, 177 Wn.2d 242, 246, 298 P.3d 720 (2013)).

[5] Riverview Cmty. Grp. v. Spencer & Livingston, 181 Wn.2d 888, 893, 337 P.3d 1076 (2014) (citing Walker v. Munro, 124 Wn.2d 402, 419, 879 P.2d 920 (1994)).

second, a cognizable interest within the "'zone of interests protected by the statute'" at issue.[6]

Ten Bridges specifically argues the second requirement is not met because it has an "unequivocal right to redeem" and Madrona Lisa has an "unequivocal right" to receive the proper redemption price from Ten Bridges.[7] Ten Bridges misunderstands Madrona Lisa's rights and its own.

The purchaser of a foreclosed property has an inchoate ownership interest in the property.[8] This interest vests once no one has the right to redeem.[9] Only a person with a valid interest in the foreclosed property, or their successor, may attempt to redeem the property.[10] If a prospective redemptioner attempts to redeem, then they take on a statutory duty to pay the purchaser the proper price, and the purchaser has a corresponding statutory right to payment.[11] Thus, Ten Bridges had a right to redeem provided it held a valid interest in the property and

---

[6] Bavand, 196 Wn. App. at 834 (quoting State v. Johnson, 179 Wn.2d 534, 552, 315 P.3d 1090 (2014)).

[7] Appellant's Br. at 11 (No. 80456-1).

[8] Fid. Mut. Sav. Bank v. Mark, 112 Wn.2d 47, 52-53, 767 P.2d 1382 (1989) (quoting W. T. Watts, Inc. v. Sherrer, 89 Wn.2d 245, 248, 571 P.2d 203 (1977)); Gray v. C.A. Harris & Son, 200 Wash. 181, 186, 93 P.2d 385 (1939).

[9] Performance Constr., LLC v. Glenn, 195 Wn. App. 406, 419, 380 P.3d 618 (2016) (citing RCW 6.21.120)).

[10] Fid. Mut. Sav. Bank, 112 Wn.2d at 53; RCW 6.23.010.

[11] See RCW 6.23.050 (referring to a purchaser's "right to payment" from a redemptioner); RCW 6.23.020(2) (defining the scope of a redemptioner's duty to pay); see also W.T. Watts, 89 Wn.2d at 248-49 (explaining purchaser's right to receive payment) (citing former RCW 6.24.140 (1987), recodified as RCW 6.23.020).

tendered the proper amount. Madrona Lisa had an inchoate interest in the condominium and a right to receive the proper amount of payment from Ten Bridges upon proof of a valid interest.

Ten Bridges relied on the first quitclaim deed to show its right to redeem. The posted redemption price at the time was $413,361.61. Ten Bridges disagreed with Madrona Lisa's calculation of the redemption price, challenging it by tendering $375,556.41 and requesting a court order setting the redemption price at that amount. Ten Bridges also asked the court to direct the sheriff to accept that price. Because this motion threatened Madrona Lisa's inchoate ownership interest and its right to the proper amount of payment,[12] it had standing to challenge the validity of the first quitclaim deed.

And because Ten Bridges' second motion to set the redemption price asked the court to set the price for less than the amount declared by Madrona Lisa and relied upon the second quitclaim deed for proof of its right to redeem, Madrona Lisa had standing to challenge the validity of the second deed.[13]

---

[12] The trial court never decided whether Madrona Lisa declared the correct redemption price, and that question is not before us.

[13] Ten Bridges argues Asano, as the grantor, is estopped from challenging the validity of the second deed. For the reasons explained below, the second quitclaim deed was illegal. Because it was illegal, Ten Bridges may not invoke the doctrine of estoppel to bar Asano's challenge. See Cooper v. Baer, 59 Wn.2d 763, 763, 370 P.2d 871 (1962) (illegal contracts may not be enforced by estoppel) (citing State v. Nw. Magnesite Co., 28 Wn.2d 1, 26, 182 P.2d 643 (1947)).

8

II. The Quitclaim Deeds Signed by Asano and Guandai Violated RCW 63.29.350

The quitclaim deeds signed by Asano and Guandai were each found to be void for violating RCW 63.29.350. Ten Bridges argues the statute does not apply. We review questions of statutory interpretation de novo.[14] We construe a statute to determine and implement the legislature's intent based on the statute's plain meaning.[15] We can use a dictionary to determine the plain meaning of a term left undefined by the statute or by its context.[16] We apply the rules of statutory construction only if a statute is ambiguous.[17]

In relevant part, RCW 63.29.350(1) provides:

> It is unlawful for any person to seek or receive from any person or contract with any person for any fee or compensation for locating or purporting to locate any . . . funds held by a county that are proceeds from a foreclosure for delinquent property taxes, assessments, or other liens . . . in excess of five percent of the value thereof returned to such owner.

A statutory violation is both a criminal misdemeanor and a deceptive practice under chapter 19.86 RCW, the Consumer Protection Act (CPA).[18]

---

[14] TracFone Wireless, Inc. v. Washington Dep't of Revenue, 170 Wn.2d 273, 281, 242 P.3d 810 (2010) (citing Lake v. Woodcreek Homeowners Ass'n, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010))

[15] Id. at 273 (citing Lake, 169 Wn.2d at 526; Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002)).

[16] Samish Indian Nation v. Dep't of Licensing, ___ Wn. App. 2d ___, 471 P.3d 261, 264 (2020) (quoting Matter of Detention of J.N., 200 Wn. App. 279, 286, 402 P.3d 380 (2017)).

[17] Berger v. Sonneland, 144 Wn.2d 91, 105, 26 P.3d 257 (2001) (citing Davis v. Dep't of Licensing, 137 Wn.2d 957, 963, 977 P.2d 554 (1999)).

[18] RCW 63.29.350.

9

Ten Bridges argues three reasons why both trial courts misconstrued RCW 63.29.350 to void its transactions with Asano and Guandai. It contends, first, the statute applies only to surplus proceeds from foreclosures of government-held liens; second, the statute applies only to proceeds held by a county, and superior court clerks are not county officers; and, third, it did not contract with Asano or Guandai to locate funds.

Other liens. Ten Bridges contends surplus proceeds from the judicial foreclosure of both condominiums were not from "property taxes, assessments, or other liens" as contemplated by RCW 63.29.350 because the statute's terms and structure suggest the legislature was referring only to "'other liens' that are held by governmental . . . entities."[19]

The statute's plain language does not support Ten Bridges. "Property taxes," "assessments," and "liens" have distinct meanings. For example, a tax must be imposed by government, while a "lien" is a "charge upon real or personal property for the satisfaction of some debt or duty ordinarily arising by operation of law."[20] Liens can be imposed by a public or private entity, including a condominium homeowners association. Ten Bridges' restrictive interpretation does not accord with the meaning of "lien."

---

[19] Appellant's Br. at 20-21 (No. 80456-1-I).

[20] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1306, 2345 (3rd ed. 2002); see Samish, 471 P.3d at 264 (court may use a dictionary when statutory terms are undefined) (quoting Det. of J.N., 200 Wn. App. at 286).

The structure of the clause does not support Ten Bridges' interpretation either. It fails to provide any applicable authority or rule of interpretation that the first noun in a series, such as "property taxes," limits or modifies the meaning of other distinct nouns in that series, such as "other liens." The plain meaning of "other liens" includes any lien that has been foreclosed upon.

Funds held by a county. Ten Bridges also argues the statute is inapplicable because funds "held by a county" are distinct from funds held by a superior court clerk.[21] It asserts the critical role of courts in disbursing surplus funds places superior court clerks solely within courts, separate from counties. Understanding the office of superior court clerk and the role it plays in receiving, holding, and disbursing excess funds from a judicial foreclosure shows why Ten Bridges' interpretation is incorrect.[22]

Article IV, section 26 of the Washington Constitution provides that each "county clerk shall be by virtue of his office, clerk of the superior court." In the majority of Washington's counties, superior court clerks are elected and serve roles within the judiciary and within county government.[23] Elected clerks fulfill "a

---

[21] Appellant's Br. at 18 (No. 80456-1-I).

[22] None of the statutes and rules Ten Bridges cites support its position because it focuses on an irrelevant portion of the statute or rule or because they are not related to a superior court clerk's role in foreclosures. Ten Bridges' reliance on a foreign case, Dowling v. Stapley, 218 Ariz. 80, 179 P.3d 960 (Ariz. Ct. App. 2008), is also misplaced because it has nothing to do with superior court clerks and addresses the meaning of "county" in an Arizona education statute.

[23] Burrowes v. Killian, 195 Wn.2d 350, 358, 459 P.3d 1082 (2020) (citing WASH. CONST. art. IV, § 26; art. XI, § 5).

constitutional position that exists outside the judicial branch."[24]  The office of superior court clerk is "essentially ministerial in its nature, and the clerk is neither the court nor a judicial officer."[25]

In King County, the county at-issue here, the superior court clerk is not elected but remains part of the county.  The King County Charter provides for a Department of Judicial Administration within the office of the county executive and explains the superior court clerk administers it.[26]  The Department of Judicial Administration is responsible for the superior court as part of the county's government and performs duties set by the county's superior court judges and by statute.[27]

The statutes governing judicial foreclosure of a homeowners association's lien for unpaid assessments also show superior court clerks act in ministerial roles outside the court system when managing surplus funds.  A homeowners association can enforce its lien judicially under chapter 61.12 RCW.[28] RCW 6.21.100 provides that the sheriff who conducted the foreclosure auction "shall return the money" and related documents to the clerk of the superior court issuing the execution order, and RCW 6.21.110(1) requires the superior court

---

[24] Id. at 361 (citing Wash. Const. art. XI, § 5).

[25] Swanson v. Olympic Peninsula Motor Coach Co., 190 Wash. 35, 38, 66 P.2d 842 (1937).

[26] KING COUNTY CHARTER art. 3, § 350.20.20.

[27] Id.; Burrowes, 195 Wn.2d at 358-59 (citing In re Recall of Riddle, 189 Wn.2d 565, 583, 403 P.3d 849 (2017)).

[28] RCW 64.34.364(2), (9).

clerk to use the auction proceeds "returned by the sheriff" to satisfy the judgment and pay "any excess proceeds" in accordance with a court order. And although the clerk may disburse excess proceeds only after a court orders them to,[29] this is no different from other ministerial acts by a county employee acting on a court's order. These statutes establish superior court clerks are fulfilling their ministerial, nonjudicial, statutory duties as county employees managing the court system when handling proceeds from judicial foreclosures.[30]

Locate or purport to locate. RCW 63.29.350 does not define "purport" or "locate." The dictionary defines "purport" as "to convey, imply, or profess outwardly."[31] To "locate" is "to seek out and discover the position of."[32] Ten Bridges contends it did not locate funds for Asano or Guandai for a fee or compensation because it discovered the funds' positions before contracting with them and even disclosed the positions for free. But this argument relies on a narrow, superficial interpretation of the statute. The prohibition in RCW 63.29.350 is not on contracting for locating or purporting to locate surplus funds. The statute caps a fund-finder's potential compensation for locating surplus funds.[33] To protect consumers, the legislature prohibited fund-finders

---

[29] RCW 6.21.110(5)(b).

[30] See Burrowes, 195 Wn.2d at 360-63 (explaining a county clerk was not fulfilling an "in-court duty" when managing court records because her record-keeping duties were set by statute and could not be altered by court rule).

[31] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1847.

[32] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1327.

[33] RCW 63.29.350(1).

from using their knowledge of the location of surplus funds held by a county following foreclosure to enrich themselves at the expense of the individuals entitled to claim the funds.

To determine whether Ten Bridges' agreements with Asano and Guandai violate the statute, we must evaluate how and why Ten Bridges was compensated by examining the substance and not the form of the agreements.[34] Ten Bridges argues it conducted mere real estate transactions, so RCW 63.29.350 does not apply. When deciding whether a law applies to a contract, we are "guided by the substance or effect of the transaction rather than the particular form or label adopted."[35] This court has explained the contracting parties' "intention[s] cannot be ascertained from . . . the name given to the instrument or to the legal relationship created, whether it be 'deed', 'contract', 'lease', or other relationship" because the substance of the agreement should determine the parties' intentions.[36] Thus, regardless of their form, Ten Bridges'

---

[34] Ten Bridges cites Nelson v. McGoldrick, 127 Wn.2d 124, 896 P.2d 1258 (1995), and International Tracers of America v. Hard, 89 Wn.2d 140, 570 P.2d 131 (1977), to argue RCW 63.29.350 applies only to contingent fee agreements. Neither case is apt because both interpret an earlier version of RCW 63.29.350 that did not include the language at-issue here.

[35] In re Smiley's Estate, 35 Wn.2d 863, 866, 216 P.2d 212 (1950); see generally Port of Longview, Cowlitz County v. Taxpayers of Port of Longview, Cowlitz County, 85 Wn.2d 216, 527 P.2d 263 (1974) (examining the substance and results of two putative leasing agreements between public ports and private industry to determine whether the contracts violated article 8, section 7 of the state constitution).

[36] In re Estate of Verbeek, 2 Wn. App. 144, 149, 467 P.2d 178 (1970); see Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 504, 115 P.3d 262

transactions with Guandai and Asano violated RCW 63.29.350 and were void if Ten Bridges sought more than five percent of the value of the funds as compensation for locating or purporting to locate the surplus funds. Assuming that Ten Bridges disclosed the funds' locations for free, the statute still applies if Ten Bridges used its knowledge from having located the funds as part of a scheme to compensate itself with more than five percent of the value of the funds.

A. Asano

In May 2019, Asano signed the first quitclaim deed assigning to Ten Bridges her interest in her condominium "together with any and all other tangible or intangible rights and funds concerning or relating to the Property, to include any interests conferred by . . . RCW 6.21 et seq., or RCW 61.12 et seq., or other applicable law."[37] Chapter 6.21 RCW and chapter 61.12 RCW provide for a judgment debtor's right to receive surplus proceeds from a foreclosure.[38] In exchange, Ten Bridges provided "$0 (Zero Dollars plus other valuable consideration)."[39] The "other valuable consideration" was Ten Bridges' promise to file a motion to obtain the $342,117.51 in surplus proceeds from the sheriff's

_____

(2005) ("[T]he subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used.").

[37] CP at 97 (No. 80456-1-I).

[38] See RCW 6.21.110(5)(a) ("Any remaining proceeds [from a judicial foreclosure] shall be paid to the judgment debtor."); RCW 61.12.150 ("Any remaining surplus [from a mortgage foreclosure] shall be paid to the mortgage debtor, his or her heirs and assigns.").

[39] CP at 97 (No. 80456-1-I).

sale and then give Asano $172,000 of it. Ten Bridges would receive compensation worth almost 50 percent of the value of the funds returned, far above the statutory cap of five percent.

Ten Bridges reads the statute as applying when a party contracts only to locate surplus funds.[40] It contends its transaction with Asano was lawful because it located the surplus funds before agreeing to connect her with them. But this reading of RCW 63.29.350 is not persuasive because it requires inserting "only" before the phrase "locating or purporting to locate."[41] In substance, Ten Bridges relied upon having located the surplus funds for a fee of almost 50 percent of the funds as compensation for obtaining the other 50 percent for Asano. The statute's purpose would be undermined if Ten Bridges could evade regulation by tying the service of locating the funds with obtaining the funds or by locating the funds before seeking compensation for having done so. Because Ten Bridges combined the services of locating surplus funds held by King County and of connecting Asano with her surplus funds, both in exchange for more than five percent of the returned funds' value, the first quitclaim deed violated

---

[40] See Appellant's Br. at 16 (No. 80456-1-I) ("In short, RCW 63.29.350 only applies to contracts that charge a fee for 'locating or purporting to locate' certain property.").

[41] See Millay v. Cam, 135 Wn.2d 193, 203, 955 P.2d 791 (1998) ("This court refrains from adding to, or subtracting from, the language of a statute unless imperatively required to make it rational.") (citing Applied Indus. Materials Corp. v. Melton, 74 Wn. App. 73, 79, 872 P.2d 87 (1994)).

RCW 63.29.350 and was void.[42]

Ten Bridges contends the court erred by concluding the second quitclaim deed was also invalid because it did not promise to obtain surplus proceeds for Asano in the second deed. Using the second deed, Asano transferred her interest in her condominium to Ten Bridges "in consideration of $0 (Zero Dollars plus other valuable consideration)."[43] Unlike the first deed, the second deed recites no other consideration in exchange for the rights and interests assigned. But when Cox proposed the second deed to Asano, he explained it "changes nothing about the agreement that you already signed," would have "no effect whatsoever on our existing agreement," and would still entitle her to $172,000.[44] Because the first quitclaim deed violated RCW 63.29.350 and the parties intended that the second deed "change[ ] nothing" from the first,[45] the second

---

[42] Asano urges affirmance on alternate grounds, arguing the quitclaim deeds were unconscionable. Because we affirm the trial court's reasoning and nothing in the record suggests Asano or Madrona Lisa raised the doctrine of unconscionability as grounds to void to transaction before the trial court, we need not consider them.

[43] CP at 534 (No. 80456-1-I).

[44] CP at 468, 504-05 (No. 80456-1-I).

[45] See Pelly v. Panasyuk, 2 Wn. App. 2d 848, 866, 413 P.3d 629 (2018) (extrinsic evidence surrounding creation of a real estate contract can show parties' objective intent) (citing Hollis v. Garwall, Inc., 137 Wn.2d 683, 695-97, 974 P.2d 836 (1999)).

quitclaim deed was also void for violating RCW 63.29.350.[46]

### B. Guandai

Ten Bridges sought to contract with Guandai because it had located surplus funds from the foreclosure on her condominium.[47] Ten Bridges offered $15,000 to Guandai in return for her remaining interest in her condominium "together with any and all other tangible or intangible rights and funds concerning or relating to the Property, to include any interests conferred by . . . RCW 6.21 et seq., or RCW 61.12 et seq., or other applicable law."[48] Chapter 6.21 RCW and chapter 61.12 RCW provide for a judgment debtor's right to receive all surplus proceeds from a foreclosure.[49] The quitclaim deed acknowledged the court clerk held approximately $90,000 in surplus funds, which Ten Bridges knew only because it had located them.

---

[46] The parties debate the applicability of the doctrine of severability, but severability does not apply where the transaction is illegal. See Brougham v. Swarva, 34 Wn. App. 68, 80, 661 P.2d 138 (1983) (doctrine applies when "'the promise sued upon is related to an illegal transaction, but is not illegal in and of itself'") (quoting Sherwood and Roberts-Yakima, Inc. v. Cohan, 2 Wn. App. 703, 710, 469 P.2d 574 (1970)).

[47] See CP at 260 (No. 80084-1-I) (Ten Bridges first contacted Guandai after the sheriff's sale); Appellant's Reply to Amicus Nw. Just. Project, et al., at 1 (No. 80084-1-I) (Ten Bridges describing its business as finding individuals who could claim surplus funds from a property foreclosure).

[48] CP at 164 (No. 80084-1-I).

[49] RCW 6.21.110(5)(a) ("Any remaining proceeds [from a judicial foreclosure] shall be paid to the judgment debtor."); RCW 61.12.150 ("Any remaining surplus [from a mortgage foreclosure] shall be paid to the mortgage debtor, his or her heirs and assigns.").

The form of the transaction—a quitclaim deed transferring Guandai's right to surplus funds for $15,000 in cash—may not appear to be a fee or compensation for locating the disclosed surplus proceeds. But here, Ten Bridges based its compensation on Guandai's assignment of her right to the surplus funds, so the substance of the transaction inherently includes compensation for having located the funds. Ten Bridges sought to gain almost 83 percent of the value of the surplus funds by offering Guandai the equivalent of 17 percent of those funds. This is, in substance, an agreement to a fee for having located and obtained surplus funds that far exceeds the statutory five percent limit. Even if there is some risk to Ten Bridges that a third party may contest its claim to the surplus funds, the substance of the agreement is a form of equity stripping barred by the statute. As explained, the statute's purpose would be undermined by limiting its applicability narrowly to offers only to "locate funds." Because Ten Bridges sought more than five percent of the value of the surplus funds as a fee for, in substance, locating and obtaining those funds, the quitclaim deed violated RCW 63.29.350 and was void.[50]

---

[50] Ten Bridges contends the trial court erroneously concluded the quitclaim deed was void because it was unconscionable or obtained through duress. The record shows otherwise. The trial court explicitly ruled against Ten Bridges solely because its agreement with Guandai violated RCW 63.29.350. See Report of Proceedings (RP) (May 31, 2019) at 59-60 (No. 800841-I); CP at 304-05 (No. 80084-1-I). Although it explained Ten Bridges' approach to negotiating with Guandai was "a form of economic duress" and the facts of the case struck the court as "an unconscionable exchange," RP (May 31, 2019) at 57 (No. 80084-1-I), that fleeting condemnation of Ten Bridges' business practices was not the basis for its decision. Ten Bridges fails to identify a reviewable error.

III.  Guandai's Surplus Funds

After voiding Guandai's quitclaim deed, the trial court ordered the superior court clerk to disburse $15,000 of the surplus funds to Ten Bridges and the remainder to Guandai.  Ten Bridges argues Guandai was not entitled to the funds because she never made a formal motion requesting them, depriving it of the opportunity to respond.  Anyone seeking disbursement of surplus funds from a foreclosure sale must file a motion and serve notice of that motion on "all persons who had an interest in the property at the time of sale, and any other party who has entered an appearance in the proceeding."[51]  The question is whether the statute was satisfied despite the absence of a formal motion.

By May 8, 2019, both Ten Bridges and Midas Mulligan had moved for disbursement of the surplus funds.  At the first hearing on the funds one week later, Midas Mulligan's counsel argued, "If Miss Guandai was here, I'd say she's entitled to it."[52]  The court declined to order disbursement at that hearing because "the money potentially belongs to the former owner of the property."[53]  Ten Bridges suggested holding another hearing with Guandai present, and the court agreed.  Guandai appeared at the next hearing, and the court found every party with an interest at the time of sale received notice and was present.  The court concluded that requiring a formal motion for another hearing would be a useless

---

[51] RCW 6.21.110(5)(b).

[52] RP (May 15, 2019) at 16 (No. 80084-1-I).

[53] Id. at 22.

act because Guandai was entitled to the surplus funds under RCW 6.21.110 and every party with an interest in the funds had presented their arguments.[54]

Ten Bridges does not dispute the trial court's findings about notice, and we conclude it had an adequate opportunity to present its argument that the quitclaim deed was valid. The only other interested party, Midas Mulligan, agreed Guandai is entitled to the funds. Because the absence of a formal motion from Guandai caused no prejudice and vacating this portion of the order would be a useless act wasting judicial resources, the trial court did not err by awarding the funds to Guandai.[55]

On cross appeal, Guandai contends the court erred by disbursing $15,000 to Ten Bridges as repayment.[56] We review the form of an equitable remedy

---

[54] Contrary to Ten Bridges' contention, it is immaterial that the trial court may have considered Guandai's presentation at the hearing as a form of testimony because the court's decision to award her the surplus fees can be affirmed entirely upon her two declarations and the rest of the record apart from her "testimony" at the hearing.

[55] See McAlmond v. City of Bremerton, 60 Wn.2d 383, 386, 374 P.2d 181 (1962) (concluding that requiring revocation and resubmittal of a petition to a city council, despite the petitioners' failure to comply with a statute, would be a useless act where the failure to comply did not deprive anyone of notice or cause prejudice, and ordering revocation would be a useless and inequitable act); Jaramillo v. Morris, 50 Wn. App. 822, 833, 750 P.2d 1301 (1988) (declining to order a new trial despite a reversible error when doing so would not change the amount of damages awarded) (citing RAP 12.2).

[56] Ten Bridges contends this matter is not properly before us because Guandai and Midas Mulligan "never argued Ten Bridges' agreement . . . was illegal and unenforceable." Appellant's Reply Br. at 22 (No. 80084-1-I). But this was the exact issue before the trial court. E.g., RP (May 31, 2019) at 34 (No. 80084-1-I) (the court discussing the effect of illegality on the quitclaim deed and how to distribute the surplus funds).

fashioned after rescission of a void contract for abuse of discretion.[57] Upon rescission, a court should attempt to return the parties to their relative positions before the contract was made.[58]

Guandai was entitled to the $89,234.72 in surplus proceeds from the sale of her condominium.[59] Ten Bridges paid her $15,000, and the trial court awarded her the difference between $89,234.72 and $15,000. Ten Bridges received $15,000. The court returned the parties to their respective positions before entering into their agreement. Guandai fails to show the court abused its discretion.

IV. Attorney Fees on Appeal

Respondents request attorney fees from this appeal under the CPA and under RAP 18.9 for answering a frivolous appeal. Neither basis is compelling. Although a violation of RCW 63.29.350 is a presumptively unfair practice under the CPA,[60] no one alleged to either trial court that Ten Bridges violated the CPA. Because a party cannot raise an entirely new claim on appeal,[61] the CPA is not a

---

[57] Hornback v. Wentworth, 132 Wn. App. 504, 513, 132 P.3d 778 (2006) (citing Willener v. Sweeting, 107 Wn.2d 388, 397, 730 P.2d 45 (1986)).

[58] Willener, 107 Wn.2d at 397.

[59] See RCW 6.21.110(5)(a) ("Any remaining proceeds [from a foreclosure] shall be paid to the judgment debtor.").

[60] RCW 63.29.350(2).

[61] RAP 2.5(a).

valid basis for an award of attorney fees.  And attorney fees are not warranted under RAP 18.9 because Ten Bridges' appeals raised debatable issues.[62]

Therefore, we affirm.

_____

WE CONCUR:

_____          _____

---

[62] See Cox v. Kroger Co., 2 Wn. App. 2d 395, 410, 409 P.3d 1191 (2018) ("'An appeal is frivolous if, considering the entire record, the court is convinced that the appeal presents no debatable issues upon which reasonable minds might differ, and that the appeal is so devoid of merit that there is no possibility of reversal.'") (quoting Advocates for Responsible Dev. v. W. Wash. Growth Mgmt. Hr'gs Bd., 170 Wn.2d 577, 580, 245 P.3d 764 (2010)).